GEORGE H. GREENSTEIN ET AL. v.
RUTH MEISTER, Administratrix
of the Estate of Nathan
Meister et al.

[No. 85, September Term, 1976.]

*Decided February 1, 1977.*

The cause was argued before SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*John F. King,* with whom were *Anderson, Coe & King* on the brief, for appellant George Greenstein. *Robert E. Scott, Jr.,* and *John J. Mudd,* with whom were *Semmes, Bowen & Semmes* on the brief, for appellant Sinai Hospital of Baltimore, Inc.

*Marvin Ellin,* with whom was *Jonathan Schochor* on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

This appeal deals mainly with questions of admissibility and sufficiency of evidence in a medical malpractice case. Appellees recovered judgments totaling approximately $214,500 against appellants, George Greenstein, an orthopedic surgeon, and Sinai Hospital of Baltimore, Inc., in the Superior Court of Baltimore City (Murphy, J.). Appellants then noted appeals to the Court of Special Appeals, but we granted certiorari prior to consideration of the case by that court. We affirm.

Although the events culminating in this appeal originated with the performance of a spinal operation, the negligence charged to the two surgeons who performed it and to Sinai Hospital occurred not during surgery, but in the postoperative stage that followed.[1] The entire episode began on the morning of Sunday March 9, 1969, when the decedent, Nathan Meister, then 49 years of age and employed as a part-time television repairman, entered Sinai Hospital for the purpose of undergoing elective surgery to be performed on the following day by Doctor Greenstein and Doctor Neal Aronson, a neurosurgeon. Mr. Meister, otherwise in good health, had for the past few years suffered from instability of the low back, which had necessitated three prior surgical

---

1. As we have intimated, only one of the surgeons is an appellant here.

procedures including one disc removal and three spinal fusions. The third operation had been performed only 18 months earlier. Since it had afforded him no relief, a fourth fusion was to be performed on the following day, Monday March 10th. Because his own blood was known to contain a characteristic described as Duffy Antigen, Mr. Meister had been tested at the Sinai blood bank a week earlier to insure the availability of an adequate supply of compatible blood during the surgery. After the blood was crossmatched, seven pints were set aside for the surgery.

On Monday March 10, Mr. Meister underwent a four-hour operation. At the outset, Doctor Aronson performed his neurosurgical procedures, which consisted essentially of explorations to ascertain the possible presence of nerve root compression. Since he found no evidence of a protruded disc, it was unnecessary for him to perform a neurosurgical operation. The services which he did render consumed about thirty minutes, whereupon he left the operating room. Doctor Greenstein then took over and performed an extensive spinal-fusion operation at the levels of L-4 to S-1. To accomplish this, a bone graft from the right hip was necessary. The combined efforts by the two surgeons were themselves uneventful and technically successful. At midnight, Mr. Meister was removed from the recovery room to his own semi-private room in satisfactory condition.

Shortly after 9:00 a.m. on the following morning, Tuesday March 11, Doctor Aronson visited Mr. Meister in his room. He found the patient lying on his side and complaining of acute pain at the donor site. Although he regarded the pain as a normal consequence of the particular surgery which had been performed, he observed that the donor site was swollen "more than what one would ordinarily expect. . . . [T]he hip seemed much more prominent to [him] than an ordinary hematoma." While he no longer considered Mr. Meister to be his patient, he was sufficiently concerned by what he had seen to telephone Doctor Greenstein, in whose care the patient had remained. Doctor Greenstein was not available, but one of his partners recommended to Doctor Aronson

that an ice pack be applied. After seeing to this and prescribing a pain medication, Doctor Aronson departed.

Although Doctor Greenstein testified that he visited the patient about midnight on the 11th, and his associate, Doctor Arthur Baitch, testified to having visited 90 minutes earlier, the hospital records failed to reveal any such visits until 10:00 a.m. on the 12th, when another orthopedic associate, Doctor Melvin Friedman, arrived. Mr. Meister, however, was seen twice on the 11th by a house physician, once at 6:00 a.m. and again at 1:15 p.m. He was, of course, also seen a number of times by nurses.

Late in the morning of the 11th, Mrs. Meister received a telephone call from her husband's roommate at the hospital, Francis C. Jackson, a Baltimore County police detective. He called at the request of Mr. Meister, whom he described as suffering from severe pain in the right hip and complaining that he was hot. Earlier that morning, he had begun to notice "a yellowish cast" over Mr. Meister's face. When Mrs. Meister arrived shortly after receiving the telephone call, she found her husband with a "slightly yellowish cast on his skin," in great pain and feverish to touch.

With the exception of a brief absence to pick up their 17-year old daughter at school, Mrs. Meister remained with her husband continuously until 9:00 p.m. on the evening of the 11th. During her stay, she testified, no physician examined Mr. Meister. The yellowish cast appeared to her "to deepen" as the day wore on. At the same time, his pain and restlessness increased, "and his face was contorted more." By the time she left at 9:00 p.m., "the yellow [color] had really deepened and he was very feverish." Some time during the evening, a nurse, at Mrs. Meister's request, took his temperature and found "it was more elevated." On learning this, Mrs. Meister asked the nurse "to call the doctor." After waiting for some time, she was called to the nurse's station at 7:45 p.m., where she was met by a physician whom she understood to be an employee of the hospital. She described to him her husband's condition and requested that the doctor make an examination. He did not

do so during her stay, but assured her that he would make one immediately after her departure.

On the next morning, March 12, when she again responded to a telephone call from Mr. Jackson, Mrs. Meister found her husband "very, very yellow, [a] deep color yellow" with one eye "back in the side of his head and the other one . . . going up and down." By then he was unable to speak. Mr. Jackson also detected a worsening of Mr. Meister's condition on the 12th when he observed the patient to be as "yellow as a banana."

Not surprisingly, therefore, the degree of attention accorded Mr. Meister increased dramatically following the arrival of Doctor Friedman on the morning of the 12th. At that time, he found the patient "grossly jaundiced." According to the hospital records, he formed the opinion, which came to be shared by virtually every other physician who saw Mr. Meister on the 12th, that the patient's condition had resulted from a blood transfusion reaction. Various remedial measures were taken by the hospital staff after 12:30 p.m. when the patient was "in shock." Among the steps initiated was the insertion of a tube to empty the stomach of fluids and gas. This procedure apparently alleviated the shock condition. Still later, he became even more jaundiced and experienced gross hemolysis — a breakdown of the red blood cells. The family physician then had him transferred to the intensive care unit where the patient was seen by a hematologist. He, too, concluded that the most likely explanation for Mr. Meister's condition was "transfusion incompatibility." Early that evening, Doctor Aronson, on being informed by a telephone call from Doctor Greenstein that the patient was "doing very badly," went immediately to the hospital and, on seeing the patient, recognized that "it was a hopeless situation." Mr. Meister died at 10:30 p.m. on the 12th.

Two death certificates were prepared. The first, executed on the 12th, listed the cause of death as "massive introvascular hemolysis" (destruction of the red blood cells) as a consequence of blood transfusion reaction. The second certificate, dated the 13th, listed the underlying cause as

"clostridial sepsis," an infection of the bloodstream, apparently of undetermined origin. This change of opinion resulted from tests conducted before and after Mr. Meister's death, which had excluded the possibility of blood transfusion reaction or contamination.

The various expert witnesses called by appellees, however, were of the further opinion — to the extent that we can state it concisely — that beneath the airtight covering at the donor site, the hematoma (accumulation of blood), a normal consequence of such an incision, had resulted in dead tissue. This served as fertile ground for the growth of the anaerobic [non-oxygen consuming] organism, clostridia perfringens, which produced a toxin resulting in gas gangrene and thus destruction of the red blood cells. This destructive process which overtook the red blood cells released two components, one in particular, a pigment called bilirubin that caused the jaundiced appearance of the skin. The depth of the yellowish color was directly related to the amount of blood cell destruction.

Following her husband's death, Mrs. Meister and her daughter brought suit against Sinai and Doctors Greenstein and Aronson. The jury, after a trial that covered a span of some 25 days and produced a transcript of almost 2500 pages, returned verdicts in favor of Doctor Aronson, but against Sinai and Doctor Greenstein in favor of Mrs. Meister, as administratrix of her husband's estate, in the sum of $152,209; in her favor individually in the sum of $56,600; and in favor of the daughter in the sum of $5,660. Appellants attack the judgments that followed on numerous grounds. Some merit only brief consideration and others may be grouped together. Appellees, however, have taken no cross appeal from the judgment for costs entered in favor of Doctor Aronson.

(1)

Both appellants challenge the qualifications of an expert witness produced by appellees, Walter Nick Laurence, an orthopedic surgeon with 30 years' practice from London, England. They contend that he was unfamiliar with the

applicable standard of care and, therefore, should not have been permitted to express his opinion on that subject. The following deficiencies in the witness's testimony, appellants argue, disqualified him as an expert witness. First, they complain because in England the entire procedure undertaken here by both the neurosurgeon and the orthopedic surgeon is performed solely by the orthopedist; the witness himself had performed 270 such operations in , the 10 years preceding the trial. Secondly, they claim that he was not qualified to testify because his testimony betrayed an ignorance of certain terminology, particularly in regard to the tradenames, as opposed to the generic names, of several medicines mentioned in the decedent's hospital records. Without exception, these medicines consisted of antacids, tranquilizers or pain killers. Significantly, none of them was an antibiotic, the very drug which, according to the witness, should have been, but was not, administered to Mr. Meister with the onset of the postoperative symptoms.

The remaining reasons for disqualifying the witness, appellants say, were that his testimony amounted to an abandonment of the "national standard" enunciated in *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. 187, 200-201, 349 A. 2d 245 (1975), for an "amorphous 'worldwide' standard," and that the effect of the witness's statement that the standard of care was the same in both countries was to make him a self-appointed expert.

It is again important to stress here that the charges of negligence leveled at both appellants centered not on the orthopedic-neurosurgical procedures followed in the operating room, but on the lack of necessary care during the postoperative period. From the outset of the trial, no question was ever raised over compliance with the standard of care applicable to the surgery itself. Furthermore, the infection which overcame Mr. Meister, according to the testimony, presents a threat in every branch of surgery.

Appellants do not question the qualifications of the witness per se, that is, they do not contend that he was not an expert in orthopedic surgery in England. Nor could they

logically have done so. Not only did he possess a rather impressive background as an orthopedic surgeon, but also the only orthopedist called as an expert witness by appellant Greenstein, Doctor Robert A. Robinson of Johns Hopkins, testified in relevant part that the American school of orthopedic surgery is based largely on the English school in regard to both surgical and postoperative care. Doctor Robinson confirmed Mr. Laurence's testimony that information was freely exchanged between orthopedic surgeons of both countries, as demonstrated by the publication of a joint British-American journal on orthopedic surgery. Furthermore, early in his career, Doctor Robinson had spent several months as a house officer at the same hospital in England at which Mr. Laurence had once been the senior Registrar (chief orthopedic resident) and at which he had also taught.

As we have suggested, Mr. Laurence testified in considerable detail during direct and cross-examination regarding the standard of care applicable not only to the surgeon in the postoperative stage, but also to the hospital. He explained how those standards had been violated and why the failures had caused Mr. Meister's death. More importantly, as we have indicated, he demonstrated at length that the standard of care for the early diagnosis and treatment of the fatal infection process is the same in both countries. Judge Murphy responded to the timely objections, and to the subsequent motions to strike Mr. Laurence's testimony, by carefully exercising the discretion which is conferred on the trial judge in such instances. As we have repeatedly emphasized, whether a witness is qualified to testify as an expert is largely within the sound discretion of the trial judge. *See, e.g., Radman v. Harold,* 279 Md. 167, 367 A. 2d 472 (1977); *Raitt v. Johns Hopkins Hospital,* 274 Md. 489, 501, 336 A. 2d 90 (1975); *Consol. Mech. Contractors v. Ball,* 263 Md. 328, 338, 283 A. 2d 154 (1971). In exercising that discretion here, the trial judge was cognizant of the objections raised, but nevertheless found the witness qualified to testify.

What we said in *Raitt v. Johns Hopkins Hospital,* 274 Md.

at 500-501, quoting from *Casualty Ins. Co. v. Messenger*, 181 Md. 295, 298-99, 29 A. 2d 653 (1943), is apposite here:

> " ' ... It is a familiar rule of evidence that a witness, in order to qualify as an expert, should have such special knowledge of the subject on which he is to testify that he can give the jury assistance in solving a problem for which their equipment of average knowledge is inadequate. It is sufficient if the court is satisfied that the expert has in some way gained such experience in the matter as would entitle his evidence to credit. . . . A witness is qualified to testify as an expert when he exhibits such a degree of knowledge as to make it appear that his opinion is of some value, whether such knowledge has been gained from observation or experience, standard books, ... or any other reliable sources. . . .' "

A further reference to *Raitt* is in order in light of appellants' emphasis on our subsequent holding in *Shilkret · v. Annapolis Emergency Hosp.*, 276 Md. at 200-01. In *Raitt v. Johns Hopkins Hospital*, 274 Md. at 500, we held that expert witnesses proffered in a medical malpractice case were not disqualified from testifying on the applicable standard of care merely because they did not practice in the same community as the physician charged with malpractice, provided they were familiar with that standard. As we there said, "the expert witness need only possess such knowledge of the applicable standard of care as will enable him to render an informed opinion." *Id.* We also underscored the distinction, which seems to have been overlooked here by appellants, "between the requisite qualifications of an expert witness and the subject matter of his testimony itself." *Id.* In sum, the witness in question here demonstrated to the satisfaction of the trial judge, who was exercising his sound discretion, that he possessed sufficient knowledge of the applicable standard of care to enable him to render an informed opinion, that is, to provide assistance

to the jurors in " 'solving a problem for which their equipment of average knowledge [was] inadequate.' " *Id.*

We hold that no error was committed here in permitting the orthopedic surgeon to testify as an expert witness.

(2)

Two further contentions, which may be treated as one, are raised concerning the admissibility of testimony presented by Mr. Laurence and another expert witness, Doctor Theodore Rodman, an internist from Philadelphia. Appellants argue first that Mr. Laurence relied on the depositions of Doctors Rodman and Greenstein for his opinion testimony even though those depositions were not admitted in evidence. Secondly, they argue that Doctor Rodman also relied on the deposition of Doctor Greenstein. Two aspects of this contention may be answered without extensive comment. Although Mr. Laurence testified to having read Doctor Rodman's deposition, he categorically stated in response to repeated questions from various counsel and from the court that he did not rely on that deposition in formulating any of his opinions. Doctor Rodman, in turn, while stating that he also had read Doctor Greenstein's deposition, never relied on it as the basis for his conclusions. The question is limited, then, to whether Mr. Laurence's opinion was properly admitted in light of his reliance, in part, on Doctor Greenstein's deposition.

It is, of course, well settled that the hypothetical opinion of an expert witness must rest upon a factual basis that is sufficient to support a rational conclusion. *Nolan v. Dillon*, 261 Md. 516, 531-32, 276 A. 2d 36 (1971). The jury must be informed of the facts or assumed facts upon which the expert's opinion is based and there must be evidence to support such facts. *State, Use of Solomon v. Fishel*, 228 Md. 189, 198, 179 A. 2d 349 (1962); *see State v. Eye, Ear, Etc., Hospital*, 177 Md. 517, 524-25, 10 A. 2d 612 (1940); *Mangione v. Snead*, 173 Md. 33, 42, 195 A. 329 (1937). Here, Mr. Laurence rested his opinions on the depositions of Doctors Greenstein and Aronson (the latter of which was read to the

jury), the hospital records, and the testimony of Francis C. Jackson, the roommate. Although his deposition was not admitted in evidence, Doctor Greenstein testified at great length during the trial. We have examined the deposition and find absolutely no testimony contained therein that was not also presented by him as a witness during the trial.[2] In short, Mr. Laurence's testimony rested entirely, for the formulation of his opinions, on facts contained in the evidence presented to the jury.

The trial judge ruled correctly, therefore, in refusing to strike any testimony presented by the witness on grounds that it lacked an evidentiary basis.

(3)

Appellant Sinai Hospital also contends that the trial court erred in permitting Mrs. Meister to relate statements made by her to the hospital physician on the evening of the 11th. This contention simply finds no support in the record. The principle which this appellant seeks to invoke is that the party who introduces the statement of an agent for the purpose of thereby binding his principal with an admission must first bear the burden of showing that an agency existed, *Wells v. Hecht Bros. & Co.*, 155 Md. 618, 623, 142 A. 258 (1928), and that the statement was made while the agent was acting within the scope of his authority, *Grzboski v. Bernheimer-Leader Stores*, 156 Md. 146, 148, 143 A. 706 (1928). This principle simply has no application here because the purpose of the testimony was not to attribute an

2. The entire argument concerning the use of Doctor Greenstein's deposition is largely an academic exercise. When the deposition was initially commenced, proceedings were abruptly terminated because, on advice of counsel, the witness refused to answer a series of questions dealing with the applicable standard of care. At that point, only meager testimony had been presented.

Some months later, following a court ruling on the disputed questions, the deposition resumed. A second dispute arose between counsel immediately with the result that the witness did little more than identify himself. The substantive testimony contained in the deposition, therefore, was so scant as to be of questionable value to any of the trial witnesses. As indicated above, Doctor Greenstein said nothing at the deposition that does not appear to have been repeated many times over during his trial testimony, which alone consumed some 300 pages in the transcript.

admission by the resident physician to his employer, the hospital. Its purpose, consistent with the theory of appellees' entire case, was to prove inattention on the part of hospital employees when certain measures, if taken at any time on the 11th or on the morning of the 12th, would probably have saved his life.

A summary of Mrs. Meister's brief encounter with the physician in question is sufficient to establish that the principle invoked by appellant Sinai has no application to this case. As we noted earlier, Mrs. Meister became alarmed at her husband's deteriorating condition toward the evening of the 11th and asked a nurse to take his temperature. When told that it was elevated, she asked the nurse to call the doctor. After waiting, she was summoned through the public address system to the nurse's station at 7:45 p.m. There she was met by a physician whose name she did not know, but who was neither of the attending surgeons nor one of their associates. As far as she knew, she testified, he was a staff doctor. She reported her husband's major symptoms to him, and he merely responded with this innocuous statement: "The visiting hours are over. You go ahead home and I'll go in." This incident is confirmed by the hospital records, which contain a nurse's entry to the effect that a Doctor Palekar (deceased when the case was reached for trial), a resident surgeon employed by the hospital, who wrote the discharge summary and who earlier in the day had twice visited the patient, was notified of Mr. Meister's temperature at 7:30 p.m.

None of the attending surgeons, nor their associates, was shown by the hospital records to have been present on the evening of the 11th. Doctor Greenstein and one of his associates, however, insisted that they made unreported visits to the patient, but this would have occurred later that evening, and neither suggested in his evidence that he was the physician who had the brief encounter with Mrs. Meister. No contradiction of Mrs. Meister's statement that she was addressing a house physician appears in the record. In sum, then, the question presented here does not concern an attempt by one party to prove an admission by the agent

of another party, where the agency or the agent's authority is in question. The testimony here was merely part of the overall effort by appellees to prove inattention and neglect.

No error, therefore, was committed in permitting Mrs. Meister to describe her conversation with the physician. We note that in addition to challenging the various evidentiary rulings of the trial judge which we have discussed here, appellants have raised an almost infinite number of subsidiary questions concerning evidence admitted at the trial. After careful consideration, we find no merit in any of them; further discussion of those rulings is therefore not warranted.

(4)

Appellant Sinai contends that the trial court erred in refusing to direct a verdict in its favor. The hospital argues that appellees failed to present sufficient evidence of the applicable standard of care; that any such standard was violated; and that any negligence on its part was the proximate cause of Mr. Meister's death. It points to evidence — presented in part during its own case — that the vital signs of the patient were routinely taken and recorded, that his condition was periodically noted, and that the orders of the attending surgeons were carried out through appropriate communication between hospital and attending physicians.

We think the evidence presented by appellees was clearly sufficient to warrant submission of the questions raised by appellants to the jury. A relatively brief summary will suffice. The expert testimony presented by appellees — mainly through Mr. Laurence and Doctor Rodman — emphasized these symptoms which appeared on the 11th: A rising pulse rate; persistent complaints of abnormal or excessive pain at the donor site; abnormal swelling at that site; the patient's complaints that he felt hot; excessive restlessness; elevated temperature; and the yellowish cast. These symptoms, the witnesses said, should have been recognized by the hospital staff on the 11th as indicative of infection. The yellowish cast alone suggested one of two

possibilities, the first of which, blood transfusion reaction caused by the known presence of Duffy Antigen in the patient's blood, should have been pursued and eliminated promptly. This, they pointed out, was not done until it was too late. Although none of appellees' experts testified that clostridial infection should have been suspected on the 11th, they were firmly of the belief that the symptoms presented sufficient evidence of some type of blood infection on the 11th to demand further investigation.

In addition, appellees' witnesses were of the opinion that the clostridial perfringens, which produced the fatal gas gangrene, entered the body at the donor site, where a substantial amount of bleeding usually occurs and produces an accumulation (hematoma) of blood. This site, if denied oxygen because of the tightness of the bandages, as claimed in this instance, can become fertile ground for the growth of anaerobic organisms such as clostridia. If not arrested, they cause devitalization of the tissue and ultimate spreading of the infection through the bloodstream, as occurred here.

Appellees' witnesses were of the opinion that the symptoms should have been observed by the hospital staff on the 11th and that the patient should have received antibiotics immediately. The patient then should have been returned to the operating room where the following procedures should have been initiated: the bandage lifted and the certain presence of odor detected; the hematoma punctured; the accumulation of blood drained, the dead tissue excised; and the patient given a blood transfusion.[3] The witnesses pointed out that antibiotics, critical in this case, were not administered until 7:30 p.m. on the 12th, far too late to have saved the patient. They also observed that any danger which could have resulted from supplying additional blood to the patient, because of the possibility of transfusion reaction, was outweighted by the alternative consequences, which, in fact, proved fatal.

---

**3.** The hospital records themselves establish that only four of the original seven units of carefully screened blood that had been allocated for Mr. Meister's surgery had been used, the remaining three thus being available during the postoperative stage.

The witnesses testified not only that the symptoms manifested by the patient on the 11th should have been observed by the hospital employees, but also that the applicable standard of hospital care required them to recognize those symptoms and to apply the measures enumerated by the witnesses. They went even further and expressed the opinion that this level of care would not have been limited to hospitals in Baltimore, or even to other metropolitan cities in this country, but represented the standard followed in other countries as well. Appellees, therefore, produced sufficient evidence for the jury to find that Sinai Hospital had failed "to use that degree of care and skill which is expected of a reasonably competent hospital in the same or similar circumstances." *Shilkret v. Annapolis Emergency Hosp.*, 276 Md. at 202.

None of the measures enumerated by appellees' witnesses was taken. The failure to do so, they said flatly, violated the duty owed the patient and thus the applicable standard of care. The expression of these opinions was as unequivocal as it was precise, and unquestionably met the requirement of probability or reasonable certainty. *Twombley v. Fuller Brush Co.*, 221 Md. 476, 488, 158 A. 2d 110 (1960); *see Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 203-204, 167 A. 2d 96 (1961).

Moreover, appellees' witnesses were equally firm in their opinions that Mr. Meister would almost certainly have survived had the steps listed by them been taken shortly after 9:00 a.m. on the 11th, and that he would probably have survived had they been taken at any later time on the 11th and before noon on the 12th. Doctor Aronson himself thought the patient might have been "salvageable" until 11:45 a.m. on the 12th. As Mr. Laurence put it, "I think [the failure of the medical hospital care] was *entirely* related to his death on March 12, 1969." (Emphasis added).

The evidence of the standard of care, that is, the duty owed by the hospital to its patient, that the standard had been violated and that the violation proximately caused the patient's death, was sufficient to warrant submission of those issues to the jury. *See generally Thomas v. Corso*, 265

Md. 84, 102-106, 288 A. 2d 379 (1972). We hold, therefore, that the trial judge committed no error in denying the motion for directed verdict.

### (5)

Both appellants complain of the trial judge's submission to the jury of the question whether damages should have been awarded for conscious pain and suffering. They observe that Mrs. Meister, in her capacity as administratrix, recovered $2209 for actual expenses, but that $150,000 was awarded by the jury as compensation for pain and suffering. Apart from their dissatisfaction with the amount itself, appellants' argument is that the evidence did not link any of the pain suffered by Mr. Meister with their negligent conduct. They argue that appellees, in presenting evidence of pain and suffering, failed to distinguish between such pain as would have been a natural consequence of the surgery or the infection, neither of which was chargeable to them, and any pain which might have been the result of their failure to discover and treat the infection.

The period of time between injury and death need not be long to permit the recovery of damages for conscious pain and suffering, provided the evidence establishes in fact that the decedent lived and was conscious after suffering injury, and experienced pain prior to his death. *Tri-State Poultry Coop. v. Carey*, 190 Md. 116, 125, 57 A. 2d 812 (1948). There, the interval between injury and death was approximately 1 hour 45 minutes. The cases are legion, many being cited in *Tri-State*, that approve such damages for even shorter periods.

Here, the testimony of both Mrs. Meister and Detective Jackson established that Mr. Meister suffered increasing pain from shortly after 9:00 a.m. on the morning of the 11th until he lost consciousness on the afternoon of the 12th. Although a fairly high level of pain was to be expected from the surgery, its severity here increased in direct proportion to the progress of the infection. At one point on the 12th, the patient went into shock and was revived only by the insertion of a tube in his stomach. Throughout this entire

period of well over 24 hours, the patient complained of the pain with increasing intensity, while moaning almost constantly. This is also confirmed by the nurses' notes which state that at 10:00 p.m. on the 11th the patient "complain[ed] of continuous pain."

In addition to the hospital records and the personal observations of Mrs. Meister and Detective Jackson, the expert testimony produced by appellees amply supported the claim for conscious pain and suffering. Mr. Laurence testified:

> ". . . [Mr. Meister] was in more pain than one could have expected, more pain tha[n] I would have expected from that kind of operation. There is no doubt in my mind that this was more pain than what he was entitled to have a patient complain about."

Elsewhere, he characterized the pain as "excessive."

When the voluminous expert testimony in this case is considered in its entirety, it clearly permits an inference that the conscious pain and suffering experienced by Mr. Meister not only exceeded the normal amount to be expected following a spinal fusion, but also that it was probably the consequence of appellants' failure to treat the infection at the proper time.

Accordingly, the evidence in this case warranted submission to the jury of the question whether damages for conscious pain and suffering should have been awarded.

Appellant Sinai Hospital also complains of an instruction to the jury pertaining to the accuracy of the hospital records. It is readily apparent, even to us, that a number of errors appear in those records. To our inexpert observation, they consist mainly of incorrect dates. Because appellees seized upon these various errors during interrogation of some of the appellants' witnesses, appellants requested the following instruction which the court granted:

> "You are instructed that discrepancies, inaccuracies, or inconsistencies in hospital records

are not by themselves to be considered by you as causing or contributing to Nathan Meister's death; and you may not conclude that the Plaintiffs are entitled to recover from the Defendants simply upon a showing of such discrepancies and inaccuracies or inconsistencies."

The court, over appellants' objection, added at the request of appellees:

". . . Such errors, if any, must be known to have caused or resulted in an improper diagnosis, or treatment of the decedent's condition which contributed to his death."

The addition of that sentence is assailed here as error, but we are at a loss to understand how appellants were prejudiced. In our view, the additional sentence presented the logical corollary to the instruction which they had requested. In any event, we find no merit in the contention.

### (6)

A further issue raised by appellant Sinai Hospital concerns the testimony of the patient's roommate, Francis Jackson. At the outset of the trial, counsel for appellants objected to his appearance as a witness because they had been informed only five days earlier — and this included a holiday weekend — that Mr. Jackson was to be called as a witness. On notifying appellants of his intention to call the witness, appellees' counsel explained that he had met Mr. Jackson for the first time on that same day, after locating him through the Baltimore County Police Department. He therefore offered his cooperation in scheduling a deposition. After listening to extended argument from counsel on appellants' objection, the trial judge resolved the impasse by delaying the commencement of the trial for approximately 48 hours, during which counsel were afforded the opportunity to interview the witness and to take his deposition. With that, the court overruled the objections to the witness's appearance and appellants' motion for a continuance, and the trial then began.

Appellant is quick to concede that the granting or denial of a continuance lies in the discretion of the trial judge and that unless arbitrary, his action in this respect will not be reviewed on appeal. *Butkus v. McClendon*, 259 Md. 170, 173, 269 A. 2d 427 (1970); *Cruis Along Boats v. Langley*, 255 Md. 139, 142, 257 A. 2d 184 (1969). Appellant contends, however, that the trial court abused its discretion here in refusing to grant a continuance. It argues that although it was afforded discovery by the deposition, it was nonetheless prejudiced by its inability "to fully investigate and test the perception powers of Mr. Jackson" and to gather additional information "for either impeachment purposes or to rebut his testimony." It is relevant to note here that neither at the trial nor at the appellate level has there been any suggestion by appellants, nor was there any by the trial judge, of bad faith on the part of appellees' counsel in locating and in producing the witness only several days before trial. The explanation, accepted by everyone concerned, was that in the deposition of Mrs. Meister, taken by appellants only two weeks earlier, the interrogation had suggested the importance of locating Mr. Jackson.

We see no abuse of discretion in the refusal to grant the continuance. On the contrary, we think the trial judge acted with commendable fairness in his handling of a difficult situation. The careful manner in which he allowed the parties to present their conflicting positions for and against the requested continuance, and his patience in seeking an effective solution negates any possible suggestion of arbitrary action on his part. While appellants undoubtedly could have put additional time to good use, the fact remains that they not only interviewed and deposed the witness at great length before the trial actually commenced, but also conducted extensive cross-examination during the trial. This resolution of the problem may not have been wholly to their liking, but it hardly bespeaks an abuse of discretion. If, as we suspect, the trial judge considered that the case had been pending for more than six years, he could scarcely have been faulted. *See Dart Drug Corp. v. Hechinger Co.*, 272 Md. 15, 28, 320 A. 2d 266 (1974).

We hold that the trial court did not abuse its discretion in refusing to grant a continuance.

(7)

Appellant Sinai Hospital contends that the damage award returned by the jury was the product of sympathy, bias, passion, prejudice or other improper motive, and that, therefore, the trial judge erred in refusing to set aside the jury verdicts. We note that the trial judge thoroughly instructed the jury on the matter of damages, particularly that the verdict was not to "be influenced in any way whatsoever by malice, prejudice, sympathy, or passion for or against any of the parties to this litigation, nor by the position or station in life of any of the parties, since both the plaintiffs and the defendants are entitled to equal treatment under the law."

Further comment upon the element of conscious pain and suffering is unnecessary here. Moreover, the pecuniary loss sustained by Mrs. Meister and her daughter finds ample support in the evidence, not only in the underlying facts, such as the respective ages of the Meisters, the amount of the decedent's earnings and the apportionment of support for appellees, but also in the form of expert testimony by an actuary.

It is axiomatic that whether a new trial should be granted because of the inadequacy or excessiveness of a verdict lies in the sound discretion of the trial judge. In a long line of cases, this Court has unswervingly refused to disturb the exercise of the trial judge's discretion in denying a motion for new trial on those grounds. *See, e.g., Kirkpatrick v. Zimmerman*, 257 Md. 215, 218, 262 A. 2d 531 (1970). If, in the exercise of his discretion, the trial judge determined, as he evidently did, that the amount of the verdicts did not shock his conscience, we see no basis for disturbing his judgment.

After careful consideration of the entire record in light of the various questions raised by appellants, we are unable to find any error.

*Judgments affirmed; appellants to pay costs.*