CHARLES ELLIOTT ALLEN, JR. *v.* STATE OF MARYLAND

[No. 897, September Term, 1977.]

*Decided July 12, 1978.*

688

The cause was argued before DAVIDSON, MOORE and MELVIN, JJ.

*Philip A. Dales, III,* with whom were *Robert H. Rosenbaum* and *Myers & Billingsley, P.A.* on the brief, for appellant.

*W. Timothy Finan, Assistant Attorney General,* with whom were *Francis Bill Burch, Attorney General, Warren B. Duckett, Jr., State's Attorney for Anne Arundel County,* and *Gerald K. Anders, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

MELVIN, J., delivered the opinion of the Court.

On August 21, 1976, a collision occurred between an 18 foot "Sleekcraft" pleasure boat powered by a 325 H. P. eight cylinder engine and operated by the appellant, Charles Elliott Allen, Jr., and another pleasure boat, a 13 foot "Boston Whaler" powered by a 40 H. P. outboard motor and operated by Charles Turner Bland. The collision occurred on the waters of South River in Anne Arundel County, just north of the Riva Bridge located near the headwaters of the river. At the time

of the collision, appellant's friend, Mr. George Ball, was his only passenger. The Boston Whaler was occupied by four persons including the operator. A fifth person, James Bland, III, was being towed by the Boston Whaler on a water ski attached to the Whaler by 75 feet of tow line.

The force of the impact between the two boats resulted in the instant death of one of the Boston Whaler's passengers. As a further result of the tragic accident appellant was convicted by a jury in the Circuit Court for Anne Arundel County (Evans, J., presiding) of the statutory misdemeanor of "manslaughter by motor boat". Md. Ann. Code, Art. 27, § 388 (1976 repl. vol.).[1] The statute reads in pertinent part as follows:

> "Every person causing the death of another as the result of the driving, operation or control of an automobile, motor vehicle, *motorboat,* locomotive, engine, car, streetcar, train or other vehicle in a grossly negligent manner, shall be guilty of a misdemeanor to be known as 'manslaughter by automobile, motor vehicle, *motorboat,* locomotive, engine, car, streetcar, train or other vehicle,' . . . ." (Emphasis added).

Appellant contends on appeal that 1) the evidence was legally insufficient to justify his conviction; 2) the trial judge erred in sustaining objections to various hypothetical questions he posed to expert witnesses; 3) he was denied a fair trial by the trial judge's failure to prohibit reference to his boat as a "jet boat" and by alleged inflammatory remarks of the prosecutor in closing argument; and 4) the jury instructions were erroneous in various respects. As we find no merit to any of these contentions, we must affirm the judgment of conviction.

---

1. By Chapter 5 of the Acts of 1949, the General Assembly repealed Section 108A of Article 99 of the Annotated Code of Maryland (1947 Supp.) that provided for the crime of "manslaughter by motorboat" on Deep Creek Lake in Garrett County and made the crime applicable state-wide, no doubt in response to the phenomenal post World War II boom in recreational boating on all waters of the State.

## Sufficiency of the Evidence

At the close of all the evidence, appellant's/ motion for judgment of acquittal was denied by the trial judge. The issue of the legal sufficiency of the evidence is therefore properly before us. *Lotharp v. State,* 231 Md. 239, 189 A. 2d 652 (1963); *Barnes v. State,* 31 Md. App. 25, 354 A. 2d 499 (1976). The scope of our review of the issue, however, is limited. We do not decide the guilt or innocence of the accused. In reviewing the sufficiency of the evidence in a jury trial, we do not inquire into and measure the weight of the evidence to ascertain whether the State has proved its case beyond a reasonable doubt. Rather it is our limited function to determine whether the evidence shows directly or supports a rational inference of the facts to be proved, from which the jury could fairly be convinced, beyond a reasonable doubt, of the offense charged. If there is such evidence, the trial judge correctly denied the motion for judgment of acquittal; if there is no such evidence, denial of the motion would be reversible error. *Wilson v. State,* 261 Md. 551, 276 A. 2d 214 (1971); *Hines v. State,* 34 Md. App. 612, 368 A. 2d 509 (1977); *Vuitch v. State,* 10 Md. App. 389, 271 A. 2d 371 (1970).

As it is with the crime of "manslaughter by automobile", the gist of the crime of "manslaughter by motorboat" is causing the death of another by operating, driving, or controlling a motorboat in a "grossly negligent manner". Whether that statutory standard has been violated depends upon "whether the conduct of the defendant, considering all the factors of the case, was such that it amounted to 'a wanton or reckless disregard for human life' ". *See Blackwell v. State,* 34 Md. App. 547, 556, 369 A. 2d 153 (1977), *cert. denied,* and *Boyd v. State,* 22 Md. App. 539, 550, 323 A. 2d 684 (1974), *cert. denied,* 272 Md. 738 (1974), and cases therein cited.

In the instant case, although the evidence is in some conflict as to the details of how and why the accident occurred and susceptible to opposing inferences, we think it was legally sufficient to support a finding that beyond a reasonable doubt the appellant operated his boat "in a grossly negligent manner" thereby "causing the death of another".

The driver of the Boston Whaler testified that shortly prior to the accident he was towing a skier on a 75 foot long tow line, proceeding southeasterly approximately 150 feet from and parallel to the southern shore of the river. He estimated his speed at between 20 and 25 M.P.H. Another boat (not involved in the accident), also towing a skier, was following behind him at a distance of approximately 200 feet. This boat, referred to in the evidence as the "blue boat", was travelling at the approximate speed of the Boston Whaler. When the Boston Whaler reached a point approximately 150 feet from the Riva Bridge spanning the river, it made a 90° turn to the left and proceeded on a course parallel to the bridge. There is evidence that when the Boston Whaler made its left turn, the Sleekcraft, driven by the appellant, was also travelling southeasterly in the approximate center of the river. At that point the river is approximately 1,600 feet wide. The driver of the Boston Whaler testified that as he "got ready to make the turn", he saw the Sleekcraft "some distance to the center and behind" him. After completing the turn the Boston Whaler proceeded on its course parallel to the bridge for a period of approximately ten seconds. The driver described the happening of the accident as follows:

"Q. All right, what happened next after you continued for that period of time?

A. We were coming parallel to the bridge .... I saw the other boat which was — now it had changed its course. It wasn't coming — going towards the south bend it was coming directly at me. I immediately cut back the throttle and the front end of our boat dropped down ....

* * *

A. Okay, what actually happened was his boat — the front end is higher in the water, you know, and especially since I — after I had cut back on the throttle the Boston Whaler the front end drops when you cut back on the throttle; our front end dropped and his boat, the front end

came over the top of ours until the about mid-point in his boat hit our left front bow.

Q. All right, the mid-point of his right or starboard side hit your left front or port side?

A. Right."

He further testified that after seeing the Sleekcraft when he made his 90° turn to the left he did not see it again until it was 30 to 50 feet from him "coming directly at me". He could not estimate the speed of the Sleekcraft in miles per hour, but said it was "fast". Other witnesses estimated its speed, variously, at 30 M.P.H. to 60 M.P.H.

The force of the impact propelled all of the Boston Whaler's occupants into the water, and, as already mentioned, caused the instantaneous death of one of them, who prior to the impact had been sitting in the left front of the boat.

The appellant elected not to testify in his own behalf. His passenger, Mr. George Ball, did testify. His testimony, however, is of little help to the appellant on the issue of appellant's gross negligence. He testified that he (Ball) saw the blue boat and its skier (that was proceeding behind the Boston Whaler) but that he at no time saw the Boston Whaler until immediately prior to the collision. He only had time to say "look out" and hear the appellant say " 'Oh, my God' and then the collision occurred".

The evidence mentioned so far, viewed in the light most favorable to the State, was legally sufficient to warrant a finding by the jury that a proximate cause of the accident and the victim's resulting death was the appellant's failure to keep a proper lookout and his further failure to keep out of the way of the Boston Whaler which was approaching him on his starboard (right) side in a crossing situation. These failures violated two important Inland Rules of the Road that govern the navigation of all vessels upon the harbors, rivers, and other navigable inland waters of the United States, not including the Great Lakes and certain Western rivers. The Inland Rules of the Road have been established by various acts of the U. S. Congress, the first enactment being in 1897 (c. 4, § 1, 30 stat. 96). In addition to these statutory Rules

of the Road, there are the "Pilot Rules", consisting of the regulations promulgated by the U. S. Coast Guard amplifying and interpreting the rules applicable to the local waters of the United States.

Both the Inland Rules and Pilot Rules are contained in a pamphlet published by the U. S. Coast Guard, designated and numbered: "Rules of the Road, International-Inland" (CG-169). They apply to all vessels on navigable inland waters and anyone who undertakes to operate a vessel (regardless of size and speed) upon these waters is charged with knowledge of their existence and the mandatory duty to obey them.[2] The Inland Rules of the Road are therefore highly relevant to a determination of negligence or gross negligence in any case involving a collision between two vessels operating on the navigable inland waters of this country. A violation of the Rules is evidence of negligence and if there is evidence that the violation is a proximate cause of a collision resulting in death and that the conduct of the defendant, considering all the factors of the case, amounted to a wanton or reckless disregard for human life, it will not be said that the evidence is insufficient to sustain a judgment of conviction of the statutory crime of "manslaughter by motorboat".

The two Rules of the Road we think the jury could have found to have been violated by appellant provide as follows:

"Art. 19. When two steam vessels [3] are crossing, so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other". (33 U.S.C.A. § 204).

---

2. M. Norris, *Your Boat and the Law,* 319-323. See also Maryland Agency Rules and Regulations, Title 08, Dept. of Natural Resources, Rule 08. 04.00, Regulations Governing Boating in Maryland, wherein it is provided that "In navigating boats, the Inland Rules of the Road set forth in Coast Guard Pamphlet CG-169, dated August 1, 1972, and amendments thereto shall be observed". While the states are free to adopt purely local rules governing navigation of boats, such rules can not validly conflict with federal rules on the subject. Obviously, there is no conflict between the Maryland and federal rules of navigation.

3. 33 U.S.C.A. § 155 defines the words "steam vessel" as including "any vessel propelled by machinery".

"Art. 29. Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect . . . *to keep a proper lookout,* or of the neglect of any precaution which may be required by the ordinary practice of seamen, or *by the special circumstances of the case*". (33 U.S.C.A. § 221) (Emphasis added.)

Corollary to the duty imposed by Art. 19 are the duties imposed by two other applicable rules:

"Art. 22. Every vessel which is directed by these rules to keep out of the way of another vessel shall, if the circumstances of the case admit, avoid crossing ahead of the other." (33 U.S.C.A. § 207).

"Art. 23. Every steam vessel which is directed by these rules to keep out of the way of another vessel shall, on approaching her, if necessary slacken her speed or stop or reverse." (33 U.S.C.A. § 208).

Corollary to the duty imposed by Art. 29 (duty to keep a proper lookout) is the so-called "General Prudential Rule" set forth in Art. 27 of the Inland Rules as follows:

"In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger". (33 U.S.C.A. § 212).

In the case at bar, there is evidence that the collision occurred at about 7:30 P. M. on a Saturday during daylight hours; that the weather was clear; that the water was calm and that there was nothing to prevent the appellant from seeing the Boston Whaler either before or after it made its 90° turn to the left. There is also evidence that the Sleekcraft is a highly maneuverable craft and has a "very good braking" capability. This is because its propulsion is achieved by a jet

water pump rather than by a conventional propeller. An expert witness, offered by the appellant, explained:

"Q. And you indicated it had very good braking. Would you describe what you mean to the jury?

A. I certainly will. In a propeller driven craft, it is necessary to bring the engine down to idle before putting it in reverse and the engine accelerated. In a jet boat this is not the case inasmuch as the only difference in the operation of forward and reverse is the direction of the water. When in forward position, the water is going to the back of the boat, that produces equal and opposite reaction to propel the boat forward. In reverse motion the water is generally pushed forward which tends to put braking thrust on the boat if it's stopped, pushed the boat backwards.

Q. Can the boat be reversed almost instantly?

A. It can be put into reverse instantly. Certainly the stopping action doesn't occur instantly.

Q. Assuming the jet boat was travelling at thirty-five miles per hour, approximately what distance would it take after it was placed into reverse to come to a stop in the water?

A. That would depend completely on the operator which was operating the boat. However, a boat such as this kind possibly could be brought to a stop as quick as I would say a hundred and twenty feet."

This evidence concerning the Sleekcraft's maneuverability and "braking" capability is relevant to the issue of whether or not the appellant kept a proper lookout (Art. 29) and also whether or not he took the necessary steps to avoid the Boston Whaler approaching him from his starboard (right) side (Arts. 22 and 23). The evidence is clear that prior to the collision the appellant did not slacken speed at all. There is some evidence, however, from which the jury could infer that a split second before the collision the appellant did attempt to avoid the Boston Whaler by turning left to cross ahead of

it. Under the circumstances, the jury could easily have found either 1) that appellant, although keeping a proper lookout, deliberately chose to rely on his craft's maneuverability and speed in an attempt to avoid the Boston Whaler "at the last minute" by crossing ahead of him — a violation of both Art. 22 (avoid crossing ahead of a privileged vessel) and Art. 23 (duty to slacken speed, stop or reverse to avoid a privileged vessel), both of which violations could easily have been avoided *because* of the Sleekcraft's maneuverability; or 2) that appellant simply was not looking where he was going, a clear violation of Art. 29.

The duty to keep a proper lookout imposed by Art. 29 applies, of course, whether or not the vessel is the privileged or burdened vessel and is perhaps the most important of all the rules of navigation. It has been described as "an inexorable requirement of prudent navigation" the failure to perform which is "so grave a default as to give rise to a strong inference that it contributed to the accident . . . ." *See* Judge Soper's opinion in *Anthony v. International Paper Company,* 289 F. 2d 574, 580-581 (4th Cir. 1961).

The jury could also have found that, although there was no speed limit at the site of the accident, appellant's speed (up to 60 M.P.H.) was unreasonable under the circumstances and, at the least, should have induced him to be particularly watchful of other craft in the area. There was also evidence, introduced without objection, that after the collision the appellant immediately drove his boat, still at high speed, from the scene without stopping to offer assistance to those who had been thrown into the water by the impact. Additionally, the State introduced evidence, again without objection, that would support a conclusion that the appellant was operating his boat under the influence of an intoxicating beverage. All of this evidence constituted relevant factors to be considered by the jury on the issue of guilt or innocence of the crime of manslaughter by motor boat. *See Boyd v. State, supra.* While there was opposing evidence introduced by the defense, it was the jury's function and not the trial judge's, nor is it our function, to determine its weight or credibility.

In sum, having carefully reviewed the record before us, we conclude that the trial judge was correct in allowing the jury

to make the ultimate decision in this case. It follows that the motion for a directed verdict was properly denied.

## Expert Testimony

### (a)

The trial judge sustained the objection to two hypothetical questions posed to a waterskiing expert called as a witness for the appellant. The questions sought to elicit testimony as to what would be "the correct method of operating the Boston Whaler" under the circumstances propounded in the hypotheticals. Appellant proffered [4] that the purpose of these questions was to show that "good seamanship under the circumstances" required the Boston Whaler "to turn right in a situation approaching the bridge, come to a stop, to slow down considerably . . . and that it was a burdened vessel".

We first note that "[i]t is generally recognized that the whole problem [of the propriety of hypothetical questions and the qualifications of witnesses to answer them] is one which should be left to the sound discretion of the trial court." *Williams v. Dawidowicz,* 209 Md. 77, 86, 120 A. 2d 399 (1956); *see also Nolan v. Dillon,* 261 Md. 516, 532, 276 A. 2d 36 (1971) and *Greenstein v. Meister,* 279 Md. 275, 368 A. 2d 451 (1977).

In the instant case, it is not at all clear from the record that the witness to whom the hypothetical questions were posed was ever qualified as an expert on "seamanship" or the applicable rules of the road. Assuming that he was so qualified, we find no abuse of discretion by the trial judge in sustaining the objections.

Whether the Boston Whaler was operated "correct[ly]" was, we think, a factor to be considered in determining whether the appellant's conduct vis-à-vis the Boston Whaler amounted to gross negligence,[5] but that issue (the

---

4. The proffer was not made until after the witness had been discharged and not until three other witnesses had testified on other matters.

5. We hasten to add, however, that once it is determined that a defendant is guilty of gross negligence in a manslaughter case, "he cannot escape the consequences by showing that the deceased was guilty of contributory negligence" or that "the negligence of the other may have concurred in producing the result". Duren v. State, 203 Md. 584, 594 (1954). *See also* Blackwell v. State, 34 Md. App. 547, 559, n. 3 (1977).

"correctness" of the Boston Whaler's operation) was one peculiarly within the province of the jury to determine under appropriate instructions from the court. While it may be true, as argued by the appellant, that in certain situations "persons of nautical skill and experience may be used to indicate usual procedure where there is a disputed question of navigation", where, as in the case before us, the navigation of vessels involved in a collision is governed by statutory rules and regulations, there is no need for expert testimony. One of the cases cited by the appellant supports this view. In *The "City of Washington,"* 92 U. S. 31 (1875), the Supreme Court said:

> " .... Parties litigant, however, are allowed in such controversies to call and examine persons of nautical skill and experience as expert witnesses; and they may, if they can, prove by them what the general usage is in respect to any disputed question of navigation *not controlled by the sailing rules prescribed by Congress;* and in certain cases, *where better guides are not furnished by law,* they may inquire of such witnesses what is and what is not good seamanship in a supposed state of the case, if the supposed state of the case is within the general scope and range of the evidence submitted for consideration of the court." *Id.* 39 (Emphasis supplied).

In the present case, the "disputed question[s] of navigation" *are* controlled by the sailing rules prescribed by Congress" (the Inland Rules) as well as by the not inconsistent Maryland regulations adopted by the Department of Natural Resources.

### (b)

Appellant next assigns as error the trial court's sustaining the State's objection to two questions asked of another witness offered as an expert "in the operation of small boats and jet boats in particular ... and also in the repair and evaluation of damages caused by accidents to small boats". The witness had examined the Sleekcraft but not the Boston

Whaler, although he was shown a photograph of the Whaler at trial. It was proffered [6] that the witness' testimony sought from the two questions "would have indicated the jet boat's attitude in the water upon impact was just on plane; and that the object that it came in contact with came in at between a forty-five and eighty degree angle and moved forward on impact; and that this determination . . . it was possible for him to make based on his examination of the marks on the jet boat alone and the knowledge that the accident had been with another smaller boat".

As with the previous questions, we see no abuse of discretion by the trial judge. We think it highly questionable that the witness, albeit an expert on the operation of and the repair and evaluation of damages to small boats, was properly qualified as an expert on the reconstruction of boat accidents. Moreover, the appellant, in his brief, does not explain, nor do we perceive, how the proffered testimony would have been helpful to the appellant or have furnished any material assistance to the jury, stating merely that the "expert testimony . . . could clearly give material assistance to the jury in drawing conclusions from the collision."

### (c)

In a valiant attempt (taking up sixteen pages of the transcript,) to elicit an expert witness' opinion of the Boston Whaler's speed prior to the collision, appellant's counsel propounded six hypothetical questions to the witness. Objections to each of the six questions were sustained by the trial judge. We are told in his brief that appellant was "attempt[ing] to demonstrate that there was no appreciable difference between the vessels['] speeds and that speed could therefore not be a factor in causation or evidence of negligence or gross negligence (in the event that determination

---

6. Again, this proffer was not made at the time of the objections and not until two succeeding witnesses had completed their testimony. No attempt was made, in view of the proffer, to recall the witness for additional questioning on the subject, nor was any further ruling on the matter sought from the trial judge.

was reached) by showing that the Whaler was necessarily travelling between 25-30 M.P.H. rather than the 20-25 testified to by the Whaler's operator and therefore, that the speeds of all the vessels were reasonable for the uses people made of the river". On appeal, appellant states that he was attempting "to elicit this testimony based upon *a* hypothetical question . . . ." (Emphasis supplied). We are not told which of the six hypotheticals the appellant desires us to review. We infer it is the last of the six.

Assuming that the issue is properly before us for review and assuming further that the trial judge may have been unduly restrictive in sustaining the objection to the question, we fail to see how the appellant was prejudiced. At best the speed of the Boston Whaler as related by its operator was an estimate (between 20 M.P.H. and 25 M.P.H.). From other questions asked the expert, who neither witnessed the accident nor was present in court during the testimony concerning the accident, it is patent that he, also, could only have estimated the Whaler's minimum speed based on the performance characteristics of the particular type ski and the weight of the skier that the Boston Whaler was towing.

Assuming that the expert would have testified that, based on the facts stated in the hypothetical question, the Boston Whaler must have been traveling at a minimum speed of "between 25-30 M.P.H.", we do not perceive that *estimate* as being so different from the operator's *estimate* (20-25 M.P.H.) as to provide the jury any material assistance in determining the gross negligence of the appellant. We therefore conclude, aside from the substantial question of whether the issue was properly preserved for review,[7] that any error by the trial court was harmless beyond a reasonable doubt. *Dorsey v. State,* 276 Md. 638, 350 A. 2d 665 (1976).

---

[7]. In addition to not specifying to us the precise question to be reviewed, we are unable to find in the record any specific proffer at trial with respect to any of the specific hypothetical questions to which objections were sustained. *See* Md. Rule 522 b. Hartsock v. Strong, 21 Md. App. 110, 120 and cases therein cited.

## Fair Trial

### (a)

At the outset of the trial, appellant made a motion *in limine* to prevent use of the term "jet boat" in referring to his boat. He contended that although the boat is "colloquially called a jet boat", use of the term was "quite inflammatory" and denoted excessive speed. The trial judge denied the motion, telling counsel for appellant that he could explain to the jury how the boat operates "and that should clear up any questions". We find no error—particularly in view of the fact that the transcript reveals numerous occasions when appellant's own counsel and his own witnesses referred to the boat as "the jet boat".

### (b)

The prosecutor concluded his closing argument to the jury with these remarks:

> "Now, Mr. Dales' presentation to you was an emotional one, but this case is not one for emotion. There are emotional factors to be considered on both sides. I'm not going to stand up here and tell you how heartbreaking it is for the family of this girl to sit here through this trial. Emotions have nothing to do with this case. You have to as a jury decide this case based on the facts as you've heard them, based on those eight elements and the rules of the road that you heard and return a fair and impartial verdict based solely on the evidence and the law. If you consider all the facts, I'm sure you'll do exactly that. Thank you."

Appellant's counsel then objected "for the record to referring to the deceased's family in the court room". No motion for a mistrial was made and no curative action was requested of the trial judge. Indeed, it does not appear from the record that counsel's objection to the particular remarks was ever ruled upon by the judge.

On appeal, appellant argues that the prosecutor's reference to the deceased's family was inflammatory and "effectively denied [him] a fair and impartial jury" because although he objected "the transgression went uncured". As previously stated, no "cure" was requested and in the absence of any ruling on the objection by the trial judge, the only issue before us is whether the failure of the trial judge *sua sponte* to take curative action amounted to a denial of appellant's constitutional right to a fair trial so as to require reversal of the judgment of conviction. We hold that it did not.

The trial judge was in the most advantageous position to evaluate any potential prejudice from the prosecutor's remarks. As stated by the Court of Appeals in *Wilhelm v. State,* 272 Md. 404, 429, 326 A. 2d 707 (1974):

> "In considering whether, in the first instance, any of the remarks attributed to the prosecutor had the effect of unfairly creating prejudice against the defendant, recognition must be given to the fact that the trial judge, who presides in the arena where the forensic adversaries are engaged, is in the best position to evaluate and assess — in the context in which the remarks are made and their relationship to other factors in the trial — whether they were in fact prejudicial. *Cook v. State,* supra; *Lusby v. State,* 217 Md. 191, 195, 141 A. 2d 893, 895 (1958).

> "In the environment of the trial the trial court is peculiarly in a superior position to judge the effect of any of the alleged improper remarks. (citations omitted.)

> "The trial judges are certainly mindful of the responsibility entrusted unto them under the holdings in *Contee v. State, supra* — if the remarks appear to be prejudicial to the defendant — to caution or reprimand the prosecutor as the exigencies of the situation may require and to instruct the jury to disregard such unwarranted remarks."

In the present case, the "exigencies of the situation" did not appear to the trial judge to require any action on his part. While we think the challenged remarks should have been left unsaid, viewed in proper context we do not think the remarks themselves or the judge's non-action with respect to them requires reversal. " 'The Maryland Rule is that unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the prosecutor's remarks, reversal of the conviction on this ground would not be justified' ". *Wilhelm v. State, supra,* at 415-416, quoting from *Reidy v. State,* 8 Md. App. 169, 259 A. 2d 66 (1969). As said by the Court of Appeals in *Wood v. State,* 192 Md. 643, 652, 65 A. 2d 316 (1949):

> "It is quite true that appeals to class prejudice or to passion are improper and may so poison the minds of jurors that an accused may be deprived of a fair trial. However, unless it appears that the jury were actually misled or were likely to have been misled or influenced to the prejudice of the accused by the remarks of the State's Attorney, this Court will not be justified in reversing a judgment of conviction solely because of intemperate remarks made in the ardor of advocacy . . . ." 192 Md. at 652.

### Jury Instructions

#### (a)

Appellant contends that the trial court failed to advise counsel in advance of argument of its proposed action on the request for instructions and the substance of the instructions which it proposed to give,[8] "thereby denying Appellant a fair opportunity to argue thereon or object thereto when given". We are referred to nothing in the record, nor have we found

---

8. Md.Rule 757 d, in effect at the time of trial, provided:

   "Where the court's charge is not delivered until after the argument of counsel to the jury, the court shall, in advance of such argument, advise counsel of its proposed action on the request for instructions and the substance of the instructions which it proposes to give."

anything, that supports this contention. Moreover, no such contention was made at trial. It is therefore not before us for review. Md. Rule 1085.

(b)

At the conclusion of the trial court's charge to the jury, before the jury retired, counsel were given an opportunity out of the hearing of the jury to make whatever objections they deemed appropriate concerning the court's advisory instructions. Maryland Rule 756 f (now Rule 757 f). The Rule requires that the objecting party state "distinctly the portion, or omission, or failure to instruct to which he objects and the ground of his objection." Maryland Rule 756 g (now Rule 757 h) provides in effect that an objection not made in compliance with section f of the Rule is not reviewable on appeal as of right.

In this appeal, appellant alleges a number of errors in the court's advisory instructions. We agree with the State that "[t]he only exception that has arguably been preserved [for appellate review] relates to the Court's failure to instruct: *'The only relevant inquiry is the manner of operation of the boat leading up to the time of impact.'"* Under our cases, however, it is clear that in manslaughter cases under the statute (Art. 27, § 388) post-impact conduct of the accused may be a relevant factor on the issue of gross negligence. *See Boyd v. State, supra,* at 550 and *Blackwell v. State, supra,* at 539, and cases cited therein. Under the circumstances revealed by the evidence in this case, the trial judge was correct is not giving the requested instruction.

(c)

With respect to other alleged errors in the instruction, appellant apparently seeks to invoke the "plain error" portion of Maryland Rule 757 h (formerly Rule 756 g),[9] providing as follows:

". . . An appellate court, either upon its own motion

---

[9]. Md. Rule 757 h, effective July 1, 1977, applies to all proceedings commenced on and after July 1, 1977, and insofar as practicable to all proceedings then pending.

> or upon the suggestion of a party, may take cognizance of and correct any plain error in the instructions, material to the rights of the defendant even though the error was not objected to as provided by section f of this Rule."

Our answer to all the contentions concerning these alleged "plain errors" is simply that after a careful review of the advisory instructions as a whole we conclude that they were entirely adequate and we find no plain error material to the rights of the accused. We deem it advisable to mention only two of the contentions: 1) that the court should not have given any advisory instructions concerning the "rules of the road" because the "state regulations [were] never presented in evidence"; and 2) that it was error to instruct the jury concerning the so-called Standby Act of 1890.

### (1)

This same contention was made by the appellant in his argument on the issue of the sufficiency of the evidence. The contention is devoid of merit and difficult to understand. Appellant does not contend that the rules of the road as recited in the instructions were not applicable or that they had not been properly adopted by the Department of Natural Resources — only that they "were never properly placed in the record". But Md. Ann. Code, Cts. & Jud. Proceedings Art., § 10-203 (a) (2) (1977 Cum. Supl.) clearly provides that a court "shall" take judicial notice of the contents of the Maryland Register and the Code of Maryland Regulations — where the regulations pertinent to this case are shown to have been adopted. *See* 2 Md. R. 1243 and 1480.

Moreover, as previously mentioned in our discussion of the sufficiency of the evidence, so far as the rules of the road are concerned the federal Inland Rules of the Road are the controlling law with respect to navigable waters in this part of the country. These federal rules are set forth in 33 U.S.C.A., § 154-232, and as public statutes of the United States, the courts of this State are permitted to judicially notice them — particularly, as here, where both the appellant and the State proceeded in trial on the assumption that they

were fully applicable. The appellant himself offered jury instructions concerning them, argued them to the jury, and made no attempt to convince the jury, as he had a right to do, that they were not the law. *See Frericks v. General Motors Corp.,* 274 Md. 288, 296, 297, 336 A. 2d 118 (1975); *Green v. Cofferstone Ltd.,* 28 Md. App. 498, 503, n. 2, 346 A. 2d 686 (1975).

(2)

The Standby Act of 1890 (33 U.S.C.A. § 367) provides that in case of collision between two vessels it is the duty of the person in charge of each vessel, "if and so far as he can do so without serious danger to his own vessel, crew and passengers (if any), to stay by the other vessel until he has ascertained that she has no need of further assistance, and to render to the other vessel, her master, crew, and passengers (if any) such assistance as may be practicable and as may be necessary in order to save them from any danger caused by the collision . . . ."

Appellant complains to us that the trial judge erred in referring to this federal statute as a "rule of the road", and that it "does not create a duty applicable to Appellant herein". We agree that, technically, the statute is not a part of the Inland Rules as established by Congress. That it is not a "rule of the road" does not mean, however, that on the evidence in this case, it was "plain error" to include its pertinent provisions in the advisory instructions. Almost identical language is used in Maryland's State Boat Act (Md. Ann. Code Natural Resources Art., § 8-724) as well as in the Federal Boat Safety Act of 1971 (46 U.S.C.A. § 1465). Whether the appellant complied with the duty imposed upon him by these statutes and, if not, the weight to be accorded such failure, were, we think, proper matters to be considered by the jury in determining the ultimate issue in this case.

Finding no reversible error, the judgment of conviction will be affirmed.

*Judgment affirmed.*
*Costs to be paid by appellant.*