# JOHN MICHAEL SOBUS *v.* CHARLES LOREN KNISLEY

[No. 221, September Term, 1970.]

*Decided February 3, 1971.*

The cause was argued before MURPHY, C.J., and ORTH, MOYLAN, and POWERS, JJ.

*Wilbur D. Preston, Jr.,* and *Stanley B. Rohd,* with whom was *C. Ferdinand Sybert* on the brief, for appellant.

*Patrick A. O'Doherty,* with whom were *Frank X. Gallagher* and *John J. Hirsch* on the brief, for appellee.

POWERS, J., delivered the opinion of the Court.

From a judgment on a jury verdict against him in favor of Charles Loren Knisley for injuries in a collision between their two automobiles, John Michael Sobus appeals. The collision occurred in Sykesville about 8:00 P.M. on May 22, 1965 at the intersection of a favored and an unfavored highway. Each was alone. Neither remembered the collision, nor the events of the preceding few moments. Appellant was on his way to work; appellee, a supervisor at Springfield State Hospital, was searching for a patient who had "eloped". Suit was filed in the Circuit Court for Howard County, and tried before Judge James Macgill and a jury.

Evidence relating to liability, largely reconstructive and inferential, was sufficient to go to the jury, and the case is not before us on that point. The questions raised are concerned with rulings on evidence. They are:

1. Did the trial court err in permitting the use of a textbook during the appellee's cross-examination of the appellant's expert witness where the appellee failed to establish that the textbook was authoritative?

2. Did the trial court err when it permitted appellee to testify to his normal route to search for elopees?

3. Did the trial court err when it permitted appellee to testify with respect to his military record and accomplishments?

I

Appellant called Francis J. Smith, an associate professor of physics at Drexel Institute of Technology in Philadelphia and holder of a master's degree in physics, as an expert witness. After *voir dire* cross-examination the court ruled that the witness was qualified, and he proceeded to testify to his conclusions and findings about the accident. In cross-examination his attention was called to a 1964 writing, Automobile Accident Cases and Scientific Reconstruction, by a Professor Lacey. After the witness stated he was not familiar with the name, appellant objected that to cross-examine on a book that is supposed to be authoritative, there has to be proof that it is authoritative. The trial judge expressed the view that counsel could ask the witness about a statement in the book, and whether he agrees with it.

What followed, relevant to the issue, was:

> "Q. I simply asked you, first of all, do you agree * * * that the use of expert witnesses [to scientifically reconstruct the scene of an accident] is a new forensic art, and that this implies that it has certain limitations. You agree with that?
>
> A. I agree that it has certain limitations, yes, sir. We've just read them in the succeeding paragraphs, and what "new" means, I don't know, what "new"—
>
> Q. Well, what "new" means, that this book is in 1964—well, I can show you how new it is. Can you tell us when you ever testified in court as an accident reconstructionist for the first time, and what court and where your evidence was admitted?
>
> A. Approximately fifteen years ago.
>
> Q. Where?
>
> A. Atlantic City. That would be Atlantic City County, New Jersey."

* * *

"Q. Right. Now, this also says that an expert of integrity must admit that there are limits to his knowledge. Do you agree with that?

A. There are limitations, yes.

Q. O.K. And those limitations are what?

A. The limitations are that in many cases we cannot give exact numbers.

Q. Numbers of what?

A. Of course the discussion on your page, sir, happens to be speed.

Q. No. No, it isn't just speed. It's an introductory paragraph to the entire subject, sir. Reaction time —

A. My answer —

Q. —skid marks, coefficient of friction, grading factors. Speed in collision is way back here, several hundred pages later.

A. Speed is —

Q. But don't you agree with the fact that's stated here, with the material that's stated here, that an expert of integrity must admit that there are limitations in this science?

A. There are limitations in this science when it comes to giving exact figures.

Q. Not figures, sir. I'm asking you, are — do you admit that there are limitations that you cannot tell how every accident happens by simply looking at pictures, or skid marks, or something of that nature?

A. I am saying that, if we are referring to an accident, it had to be the result of natural laws, sir."

* * *

"Q. Do you agree with this statement, that, "While a physicist may be extremely learned in his specialty, unless he has studied diligently and had actual experience in accident reconstruction, his conclusions and opinions

may be completely unfounded and errone-
ous." Do you agree with that?"

\* \* \*

"A. Yes, if he had not had actual experience, I
guess so."

\* \* \*

"Q. Do you agree with the statement of this ex-
pert that, "The qualification of an expert as
a physicist may greatly impress the Jury,
but an academic degree in physics does not
necessarily mean that his opinion must be
accepted as gospel"?

A. I agree with that, yes."

The Court of Appeals has never been called upon to de-
termine the basis upon which texts or writings may be
used in cross-examination to impeach or discredit the
testimony of an expert witness. In *Eckels v. Cornell Econ-
omizer Co.*, 119 Md. 107, 86 A. 38 (1912) the Court com-
mented at page 114 as a dictum, after noting that medi-
cal books are not admissible to sustain or contradict the
opinion of a witness, "But it is generally held, that in
cross-examination questions may be based upon the con-
tents thereof, or extracts therefrom to test the value of
the opinion of the witness".

Other courts and writers express varying views. Some
say the writing must have been relied upon by the wit-
ness in reaching his conclusions; some that the witness
must recognize the writing or author as authoritative;
some that the writing must be shown to be recognized as
authoritative, but not necessarily by the witness; some
that the writing may be used if it is a "standard author-
ity"; some that in a proper case the court may take ju-
dicial notice of the authoritative nature of the text.

We are not disposed to undertake the formulation of
a rule on the basis of the record in this case. The witness
did not disagree with any statement read to him from
the writing. On no point was the jury required to choose
between the testimony of Professor Smith and the "si-

lent witness". If the objection was properly presented and preserved, and if the ruling of the court was error, neither of which we need decide, it was harmless.

## II

Knisley, having no recollection of the collision, testified without objection to his routine in seeking and returning a patient who had eloped from the hospital, and described the route. After being withdrawn and subsequently resuming the stand, giving further direct examination, and being cross-examined, he was asked on redirect to mark on a map already in evidence as an exhibit the route he normally took in the search for elopees, from downtown [Sykesville].

In his direct testimony Knisley said there was a routine or habit he followed in such a search. Although somewhat rambling and perhaps susceptible of more than one interpretation, the testimony described a route from the hospital down through the main part of Sykesville, stopping to report to and ask cooperation of a town policeman, then across the bridge and up Route 32 back to the hospital. One might infer a different route from his statement that if they were alcoholics (which this patient was not) he would get as fast as he could across the bridge to the bars, then make the loop and come back on Route 32. However, he said there was a chance to find them hitchhiking on Route 32, coming back, and he did not qualify his statement that there was one routine, not only for this type of patient.

Between Knisley's two appearances on the stand, Millard F. Cooper testified that he was a town policeman in Sykesville; that at 7:50 to 7:53 he was at the intersection of Main Street (old Route 32) and Marriottsville Road in Sykesville, directing traffic; that Knisley came by, stopped and told him about the patient he was looking for, and that he was going out and hit the bypass, Route 32; that Knisley drove off to the south and the witness saw him as far as the bridge over the river; and that after you pass Marriottsville Road, you have to go out there

(to Route 32) or turn around and come back, because there is no other road.

Through Officer Cooper appellee introduced Exhibit 18, a State Roads Commission map of the Sykesville area, showing the main road through the town, and the bypass where Route 32 leaves, then rejoins the old road. Officer Cooper made a mark on the map to show where he was when he talked to Knisley, drew a black line along the road to the bridge over the Patapsco River leading into Howard County, where he said he saw Knisley drive, then drew a red line on the map from there south on the old road to its junction with new Route 32 at the south end of the bypass, and from there north on the Route 32 bypass to and beyond the intersection where the collision occurred, designating that as the route Knisley had told him he was going to take.

This testimony of the officer, although it went in after objection, was clearly admissible. In *Maryland Paper Products Co. v. Judson*, 215 Md. 577, 590-591, 139 A. 2d 219 (1958), the Court of Appeals reviewed authorities and held that evidence of a declaration of a plan, design, or intention presently entertained is, subject to certain limitations, admissible as evidence that the design was carried out.

When Knisley was asked on redirect examination to mark his normal route on the map then in evidence, appellant made a general objection. After a few questions by the judge, the witness was permitted to draw his normal route, in green, proceeding from downtown south to the bypass junction, and north on Route 32 back to the hospital. He stated, "that's the first trip that is taken in search of any patient that leaves Springfield State Hospital. That's the initial one."

In support of his contention that it was error to permit appellee to testify to (or depict graphically) his normal route to search for elopees, appellant refers to Wigmore, where it is said, I Wigmore on Evidence, Third Edition, § 92:

"Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt. Every day's experience and reasoning make it clear enough:"

Wigmore then goes on to discuss cases in which the evidence may not show sufficient regularity to make it probable that it would be carried out in every instance or in most instances. He then goes on to say, in § 93:

"Subject to the foregoing distinctions, the admissibility of a person's habit, usage, or custom as evidence that he did or did not do the act in question may be said to be universally conceded."

In McCormick, Law of Evidence, § 162, it is said that expediency and sound reason would lead to the approach:

"* * * that evidence that an act was habitually done by X under like circumstances will be received as evidence that it was done by X on the particular occasion."

We find no error in the rulings of the trial court on this evidence.

### III

Appellant urges that he was prejudiced by admission of testimony by Knisley of his military experiences during World War II, when he served in the Pacific for 28 months, was wounded three times, received the Silver and Bronze stars, and after his second battle wound, though eligible to return home, preferred to remain and fight. To show prejudice he calls attention to the argument of counsel which "served only to arouse the emotions and sympathy of the jury". Whether the jury was so aroused and its verdict affected was for Judge Macgill to consider on motion for new trial, 17 M.L.E. New Trial § 5. We note from the record that such a motion was made and denied, and the question is not before us.

Whether the testimony was admitted in error is before us, and we now proceed to consider it.

After a series of questions and answers which quite thoroughly outlined Knisley's military experiences to the jury, counsel for appellant objected "to further questioning along this line". No motion was made to strike what had been said. Under Maryland Rules 522 and 1085, we do not consider the admissibility of the testimony given up to that point. Knisley's counsel stated that the evidence was offered "because later an allegation may be made that this man is a malingerer". This anticipated defense position was not disclaimed. The court held it permissible for that purpose. There were then two additional questions and answers on the subject, without further objection. Neither lent any discernible embellishment to the picture already before the jury. If the court's ruling, when made, was error, it wrought no harm.

Cases from other jurisdictions, cited by appellant as holding a party's war record inadmissible, have been examined. In three the question was squarely presented by prompt objection; in one the point was incidental and timely objection may be assumed; and in the other the appellate court held that a mistrial should have been granted after an unresponsive and either spontaneous or planned interjection of the subject by a party.

The dilemma of counsel when this subject was opened up is apparent. They were required to judge which would cause more harm to the defendant; to let the jury hear the plaintiff's war record, or to object to their hearing it. When this tactical decision was made, the die was cast. If it was detrimental, appellant may not complain.

- - - -

We find no reversible error, and affirm the judgment.

*Judgment affirmed.*
*Appellant to pay costs.*