REPORTED
IN THE COURT OF SPECIAL APPEALS
OF MARYLAND
No. 807
September Term, 2011

SEAN ROSEBROCK, INDIVIDUALLY,
AND AS GUARDIAN OF JUDITH PHILLIPS

v.

EASTERN SHORE EMERGENCY
PHYSICIANS, LLC, ET AL.

Woodward,
Zarnoch,
Kenney, James A., III
(Retired, Specially Assigned),

JJ.

Opinion by Woodward, J.

Filed: January 28, 2015

On May 14, 2009, appellant, Sean Rosebrock individually and as guardian of Judith Phillips, filed a complaint for medical malpractice in the Circuit Court for Baltimore City, against, among others, appellees, Deborah Davis, M.D.; Eastern Shore Emergency Medicine Physicians, LLC; and Shore Health System, Inc. ("Shore System"). The matter was subsequently transferred by agreement to the Circuit Court for Queen Anne's County, where a jury trial commenced on March 28, 2011. On April 7, 2011, the jury returned a verdict in favor of appellees, concluding that Dr. Davis was not negligent in her care and treatment of Phillips.

On appeal, appellant presents five issues for our review, which we have condensed and rephrased into two questions:[1]

     1.     Did the trial court err or abuse its discretion by admitting, as

---

[1] Appellant's five issues presented in his brief are:

    1.     Whether the trial court erred when it allowed Appellee to testify concerning "habit" without support or corroboration.

    2.     Whether the trial court abused its discretion when it allowed Appellee to testify regarding "habit" under MD. Rule 5-406.

    3.     Whether the trial court abused its discretion when it allowed Appellees' expert witnesses to testify over Appellant's objection pursuant to MD. Rules 5-402, 5-702, and 5-703.

    4.     Whether the trial court abused its discretion pursuant to the evidentiary rules in allowing admission of Appellees['] evidence.

    5.     Whether the trial court abused its discretion when it denied Appellant's motion for judgment and motion for judgment notwithstanding the verdict or in the alternative new trial.

"habit" evidence under Maryland Rule 5-406, Dr. Davis's testimony regarding her customary practice when presented with a patient immobilized on a backboard?

2. Did the trial court abuse its discretion, under Rules 5-702 and 5-703, by allowing appellees' experts to testify regarding Dr. Davis's compliance with the standard of care in her examination of Phillips?

Appellees filed a conditional cross-appeal and present three issues,[2] which, as stated in their brief, are:

1. Whether the trial court erred in denying Appellees' Motion for Judgment on the statute of limitations, and refusing to instruct the jury on that issue[.]

2. Whether the trial court erred in refusing to instruct the jury on contributory negligence[.]

3. Whether the trial court incorrectly allowed Appellant to present evidence of and argue non-economic damages for a period after [ ] Phillips entered a persistent vegetative state[.]

In addition, appellees filed a motion to dismiss the instant appeal, which, for the reasons stated herein, we shall deny. We answer both of appellant's questions in the negative and thus shall affirm the judgment of the circuit court. As a result, we need not address the issues raised in appellees' conditional cross-appeal.

## BACKGROUND

On November 21, 2003, Phillips slipped and fell on a wet floor in a patient's room

---

[2] Appellees actually present two additional issues on appeal—one simply states the motion to dismiss as an issue and the other rephrases appellant's first question.

2

while on duty as a nurse's aide at the Ruxton Nursing Home located in Denton, Maryland. Emergency Medical Technicians arrived at the scene of the incident and noted that Phillips complained of "right hip pain, right knee pain, and slight pain to the lumbar region of the lower back." Phillips was immobilized on a backboard and transported by ambulance to the Emergency Department of Shore System's Memorial Hospital in Easton, Maryland.

Upon arrival at the hospital at 2:20 a.m., Phillips was assessed by triage nurse Richard Brooks, who documented that Phillips was experiencing pain in the right knee, right hip, and lower back. At 2:35 a.m., Dr. Davis, as attending physician, took a history of the incident from Phillips and then examined her. The Emergency Physician Record of Dr. Davis's examination of Phillips indicated that Phillips was experiencing pain in her right knee and right hip. Dr. Davis's assessment did not include any notation of Phillips experiencing back pain, and the portion of the Emergency Physician Record that provides for documentation of a back examination was left blank. After reviewing the x-rays of Phillips's right knee and right hip, which were negative for fractures, Dr. Davis diagnosed Phillips as having knee and hip contusions. Phillips was discharged from Memorial Hospital at 3:30 a.m.

On November 24, 2003, Phillips consulted Richard Bourgogne, M.D., complaining of soreness in her hip, knee, and back. Dr. Bourgogne assessed Phillips as having "leg pain" and increased her dosage of Celebrex. Dr. Bourgogne planned to do an MRI if significant pain continued without improvement for 48 hours and advised Phillips to go to the emergency room if her condition worsened. On December 1, 2003, Dr. Burgoyne ordered

3

an MRI of Phillips's right hip that showed the hip to be "unremarkable" and without fracture. The MRI also showed degenerative disc disease in the lower lumbar spine.

On December 9, 2003, with her condition worsening, Phillips visited Glenn Hardy, M.D., at the Orthopedic Center in Easton, Maryland.[3] Dr. Hardy ordered X-rays of Phillips's back, which revealed an acute compression fracture of the L3 vertebrae, "with possible retropulsed fragment[s] causing nerve root compression." Due to "significant nerve root impairment," Phillips was sent by ambulance to Memorial Hospital to see Benjamin Knox, M.D., for a CT scan and evaluation. The CT scan revealed that Phillips had a "burst fracture" of the L3 vertebrae, and she was subsequently transported to the University of Maryland Shock Trauma Center for further treatment. The Orthopedics department "decided to have a trial of [Thoracic-Lumbar-Sacral Orthosis] bracing." Because her condition failed to respond to the bracing treatment, on December 15, 2003, Phillips underwent a "posterior spinal fusion and anterior spinal fusion" to correct the L3 burst fracture. On December 19, 2003, Phillips was discharged to Corsica Hills Center to begin rehabilitation.

When she experienced an "elevated white blood cell count and fever," Phillips was transferred back to the University of Maryland on December 27, 2003, where she received treatment for an infected surgical wound. Unexpectedly, on January 4, 2004, Phillips "sustained a ventricular fibrillation arrest in which she suffered anoxic brain injury." As a

---

[3] Between the initial incident on November 21, 2003 and the December 9, 2003 appointment with Dr. Hardy, Phillips "had several falls at home," including two falls on November 30, 2003.

result, Phillips entered into a persistent vegetative state and stayed in that condition until her death on June 12, 2011.

On May 14, 2009, Phillips, by and through appellant, as her guardian, filed a complaint in the Circuit Court for Baltimore City, asserting, among other claims, one count of negligence against appellees. On January 13, 2010, the case was transferred by agreement to the Circuit Court for Queen Anne's County. A jury trial commenced on March 28, 2011, and, on April 7, 2011, the jury found that Dr. Davis was not negligent in her care and treatment of Phillips on November 21, 2003.

On April 15, 2011, appellant filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial, claiming error in the trial court's admission of "habit" testimony pertaining to Dr. Davis's examination of individuals who are presented in the emergency room on a backboard. On May 18, 2011, without a hearing, the circuit court denied appellant's motion. On June 12, 2011, Phillips passed away. On June 13, 2011, appellant's counsel filed a timely notice of appeal.

## PROCEDURAL HISTORY IN THE COURT OF SPECIAL APPEALS

On December 9, 2011, while the appeal in the instant case was pending in this Court, but before any briefs were filed or oral argument was held, appellees filed a motion to dismiss the appeal. In their motion, appellees stated that they had recently received information that Phillips died after judgment was entered in the trial court, but before the Notice of Appeal was filed. As a result, according to appellees, appellant, as guardian of

5

Phillips, did not have the authority to file the Notice of Appeal. Appellees further asserted that appellant was required to substitute the Personal Representative of Phillips's estate as a party in the instant appeal prior to any further proceedings, and that as of the time of the filing of the motion to dismiss, appellees had been "unable to determine that an Estate had] been opened for [ ] Phillips or that a Personal Representative had] been properly granted Letters of Administration." Appellees concluded that the failure to substitute the Personal Representative as a proper party rendered all filings by appellant subsequent to Phillips's death nullities, including the Notice of Appeal.

Appellees also argued that appellant's counsel "similarly lacked the legal authority to file an appeal after [ ] Phillips died." Appellees cited to "well-established agency law principles," which provide that "an attorney has no authority to act for a client who has died." Thus, according to appellees, appellant's counsel did not have authority to file an appeal on behalf of Phillips after she passed away, and because an appeal was filed when counsel lacked authority to do so, the Notice of Appeal was a nullity, and the appeal must be dismissed.

Apparently unbeknownst to appellees, one day prior to the filing of their motion to dismiss, December 8, 2011, Letters of Administration for Phillips's estate were granted to appellant by the Register of Wills for Queen Anne's County. On December 21, 2011, appellant filed a Notice of Substitution in this Court, in which appellant advised us of his appointment as Personal Representative and requested that the "parties herein [ ] reflect the

6

Plaintiff [sic] as Sean Rosebrock as] Personal Representative of the Estate of Judith Phillips."

Also on December 21, 2011, appellant filed an Opposition to the Motion to Dismiss. In the opposition, appellant stated, among other things, that (1) Phillips died at 10:28 p.m. on June 12, 2011; (2) "[pursuant to instructions given to counsel prior to the passing of [ ] Phillips, a Notice of Appeal was prepared and filed in the above matter on June 13, 2011"; and (3) "[counsel was unaware of [ ] Phillips['s] passing when the Notice of Appeal was filed subsequently, less than 16 hours after her passing." Because a Notice of Substitution had been filed substituting the appearance of appellant as guardian with appellant as Personal Representative, appellant concluded that the proper party had made an appearance in the instant appeal, and thus appellee's motion to dismiss should be denied.

This Court took no action on appellees' motion to dismiss. When the parties filed their briefs in the instant appeal in the Spring of 2012, appellees included a motion to dismiss in their brief. Oral argument was held on October 9, 2012.

Three days after oral argument, on October 12, 2012, appellant filed a Motion to Extend Time for Filing Substitution ("motion to extend time"). In the motion to extend time, appellant alleged that, once counsel learned of the death of Phillips, "the process of getting an Estate filed was immediately begun expeditiously and was completed on December [8], 2011." Appellant also stated that appellees' motion to dismiss was filed "based on [a] failure to extend the time period for filing of the Estate." Because, according to appellant, a Notice of Substitution had been filed and no prejudice had been suffered by appellees because of the

7

delay in his appointment as Personal Representative, appellant requested this Court "to retroactively issue an Order extending the time period for filing a Substitution of Party to allow for the Substitution as here entered."

On October 12, 2012, appellees filed an Opposition to Motion to Extend Time For Filing Substitution ("opposition to motion to extend time"). In the opposition to motion to extend time, appellees asserted that appellant had noted the appeal on June 13, 2011, in his capacity as guardian, before an estate had been opened or a personal representative appointed for Phillips's estate. Appellees also stated that appellant was not appointed Personal Representative of Phillips's estate until almost six months later, on December 8, 2011. According to appellees, Maryland Rule 1-203(d) "provides the representatives of a deceased party at least 60 days to substitute the proper party," which time period can be extended only on a showing of "good cause" and a lack of prejudice to the rights of any other party. Because, according to appellees, the motion to extend time contained no factual basis for this Court to find "good cause why a proper substitution was not, or could not have been made in a timely fashion," there was no basis for an extension of the Rule 1-203(d) time frame, and thus the appeal must be dismissed.

Additional facts will be set forth herein as necessary to resolve the motion to dismiss, the motion to extend time, and the questions presented in this appeal.

## DISCUSSION

### 1. Motion to Dismiss

In their brief, appellees raise the same arguments in support of their motion to dismiss as they did in their motion filed on December 9, 2011. Specifically, appellees argue that, although appellant was the duly appointed guardian of Phillips, his authority to act on her behalf ceased upon her death on June 12, 2011. Because the Notice of Appeal was filed on June 13, 2011, appellees conclude that, "[as guardian and not personal representative, [appellant] did not have this authority, and thus, his appeal is a nullity."

In addition, appellees contend that the attorneys who represented Phillips's interests in the circuit court lacked the legal authority to file this appeal on her behalf once she died on June 12, 2011. Appellees assert that, upon the death of Phillips, Maryland Rules 2-241 and 1-203(d) "afforded [appellant a process and time frame in which to have the proper party substituted to pursue this appeal." Appellees conclude that "this appeal should be dismissed pursuant to Maryland Rule 8-602(a)(1) and/or Rule 8-602(a)(9)."

Appellant responds that, as the appointed guardian of Phillips, he remained responsible for her "property and person" until the guardianship was terminated by the court order entered on April 25, 2012. Appellant contends that, because he acted as the guardian of Phillips's property and person from July 5, 2005 until April 25, 2012, he was legally authorized to file the instant appeal the day following Phillips's death. In addition, appellant contends that, because his attorneys were not aware of the death of Phillips when they filed

9

the appeal, appellees' "attempt to gain an advantage by the untimely death of [ ] Phillips is certainly unwarranted."

"A guardian is a person who legally has the care of the person or property, or both, of another person who is incompetent to act for himself or herself." 11 Md. Law Encyclopedia, Guardian & Ward § 1 (2014). A guardianship is a statutory concept that gives the court discretion in appointing a guardian and conferring narrow guardianship powers. *See* Md. Code (1974, 2011 Repl. Vol.), §§ 13-201, -213 of the Estates & Trusts Article ("ET"). A guardianship will terminate at the "death or presumptive death of the minor or disabled person." ET § 13-221(b)(2). The powers and duties of a guardian whose capacity has been extinguished by the death of the ward are limited. Upon the death of the ward, the guardian is authorized only to

> deliver to the appropriate probate court for safekeeping any will of the deceased person in his possession, pay from the estate all commissions, fees, and expenses shown on the court-approved final guardianship account, inform the personal representative or a beneficiary named in it that he has done so, and retain the balance of the estate for delivery to an appointed personal representative of the decedent or other person entitled to it.

ET § 13-214(c)(3); *cf. Battle v. Banks*, 177 Md. App. 638, 651 (2007).

Moreover, Section 7-401(y) provides that the personal representative of an estate is authorized to maintain an action to prosecute or defend personal claims that a decedent may have prosecuted or commenced. ET § 7-401(y). A guardian thus has the authority to prosecute an action on the ward's behalf only when the ward is alive. Upon the death of the

10

ward (now decedent), the only person who may prosecute an action on the decedent's behalf is the personal representative.

"[Under well-established principles of agency law, an agent's authority terminates upon the death of the principal." *Brantley v. Fallston Gen. Hosp. Inc.*, 333 Md. 507, 511 (1994) (citation omitted). An attorney does not have authority to note an appeal on behalf of a client who has died. *Id.* at 511; *see also* Restatement (Third) of Law Governing Lawyers § 31(2)(b) (stating that "a lawyer's actual authority to represent a client ends when . . . the client dies"). In *Brantley*, the Court of Appeals noted the importance of having the appropriate party file an appeal, stating:

> We hold in this case that counsel's authority to file an appeal terminated upon the death of his client. At the time he noted the appeal, no personal representative had been appointed, and no other real party in interest had been substituted in the action. Thus, when counsel filed the appeal, he purported to be acting on behalf of a non-existing client.

333 Md. at 512 (footnote omitted). The Court of Appeals also has held that, when an attorney files an appeal on behalf of a client who has died, it is "not a mere irregularity, but a complete and radical defect, requiring dismissal of the appeal." *Chmurny v. State*, 392 Md. 159 (2006) (citation and internal quotation marks omitted).

What guardianship and agency law principles set forth above do not address, however, is the authority of the agent *after* the principal dies, but before the agent *learns* of the principal's death. The *Barnsley* case does not address that point, nor does any other Maryland case law. *See* 333 Md. 507. Such authority is critical in the instant case, because

11

appellant argues that he, as Phillips's guardian, authorized counsel *prior to Phillips's death* to note an appeal, which counsel did less than sixteen hours after Phillips's death, but before counsel received notice of her death.

Section 3.07(2) of the Restatement (Third) of Agency (2006) states the following:

> **The death of an individual principal terminates the agent's actual authority. The termination is effective only when the agent has notice of the principal's death.** The termination is also effective as against a third party with whom the agent deals when the third party has notice of the principal's death.

(Emphasis added).

The purpose of Section 3.07(2) "is to reduce risks imposed by the common-law rule upon agents and third parties who deal in a manner consistent with the principal's prior manifestations of assent." § 3.07 CMT. d. Consequently, Section 3.07 seeks to avoid any "harsh consequences" resulting when an agent, "unaware of the principal's death, . . . acts] in good faith following it." *Id*.

We shall adopt Section 3.07 of the Restatement (Third) of Agency to avoid such "harsh consequences." *See id.* Therefore, actions taken by the agent under his or her authority and prior to notice of the principal's death are valid. Accordingly, in the instant case, because appellant's counsel was given authority to note the appeal pursuant to appellant's instructions as guardian prior to Phillips's death, and because counsel noted the appeal prior to being notified of Phillips's death, appellant's counsel had valid authority to note the appeal.

12

Contrary to the arguments of both parties, we do not believe that Rule 1-203(d) is applicable to the instant case. Rule 1-203(d) reads:

> Upon the death of a party, all time requirements under these rules applicable to that party shall be extended automatically from the date of death to the earlier of (1) 60 days after the date of death or (2) 15 days from the issuance of letters of administration by a court of competent jurisdiction. Before or after the expiration of an extension period under this section and upon a showing of good cause why a proper substitution was not made or could not have been made prior to the expiration of the extension and that a further extension will not unfairly prejudice the rights of any other party, the court may extend the time requirements applicable to the deceased party for an additional period commencing upon the expiration of the extension.

In essence, Rule 1-203(d) provides that all time requirements for filing are extended for sixty days upon the death of a party, and can be extended for an additional period upon a showing of good cause. Rule 1-203(d), however, does not come into play when a valid notice of appeal is filed within thirty days after the entry of a final judgment by the circuit court. Because, as we have held, appellant's counsel had the authority to file an appeal on June 13, 2011, pursuant to Section 3.07 of the Restatement (Third) of Agency, and the date of filing of the Notice of Appeal, June 13, 2011, was within thirty days of the trial court's denial of appellant's motion for judgment notwithstanding the verdict, May 18, 2011, there is no need to look to Rule 1-203(d) for an extension of the time requirement for filing the appeal. Accordingly, we will deny appellant's motion to extend time as moot.

In terms of appellant's authority to prosecute the instant appeal, Rule 2-241 provides for the substitution of the personal representative, upon the death of a party, to prosecute a

13

validly-noted appeal. Rule 2-241 provides, in relevant part:

> (a) **Substitution.** The proper person may be substituted for a party who:
>
> (1) dies, if the action survives
>
>         \*\*\*
>
> (b) **Procedure. Any party to the action**, any other person affected by the action, the successors **or representatives of the party**, or the court **may file a notice in the action substituting the proper person as a party.** The notice shall set forth the reasons for the substitution and, in the case of death, the decedent's representatives, domicile, and date and place of death if known. The notice shall be served on all parties in accordance with Rule 1-321 and on the substituted party in the manner provided by Rule 2-121, unless the substituted party has previously submitted to the jurisdiction of the court.
>
> (c) **Objection. Within 15 days after the service of the notice of substitution, a motion to strike the substitution may be filed.**
>
> (d) **Failure to Substitute.** If substitution is not made as provided in this Rule, the court may dismiss the action, continue the trial or hearing, or take such other action as justice may require.

(Emphasis added).

As can readily be seen, Rule 2-241 imposes no time requirement for filing a notice of substitution upon the death of a party. The Rule simply provides that upon filing a notice of substitution, any opposing party may file a motion to strike within fifteen days. *See* Rule 2-241(c). Here, appellant filed a notice of substitution on December 21, 2011; appellees did not file a motion to strike. The notice of substitution therefore is valid to permit appellant,

14

as personal representative, to prosecute the instant appeal. Indeed, the parties' briefs were filed and oral argument was held after the notice of substitution was filed by appellant. Accordingly, appellant had proper authority to prosecute this appeal, which had been validly filed. For these reasons, we will deny the motion to dismiss.

## 2. Admissibility of Habit Evidence

Appellant argues that the court erred by allowing Dr. Davis to testify regarding her habit of examining a patient on a backboard, because (1) Dr. Davis's testimony regarding her regular routine of examination was not the type of "habitual response" allowed by Rule 5-406; (2) the testimony was not supported or corroborated by additional evidence; and (3) the testimony runs afoul of the balancing test elucidated in Rule 5-403, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice. For the reasons stated below, we disagree.

### *(a) Rule 5-406*

Appellant argues that appellees "failed to show how the examination of patients brought in after experiencing a fall, was the type of *nonvolitional activity* that was performed with *invariable regularity*, as well as establishing [ ] the semi-automatic nature of such examination." (Emphasis in brief.) Appellees respond that, although there is a "dearth of Maryland case law" regarding Rule 5-406, the procedure involved with moving someone from a backboard in an emergency room is the type of nonvolitional conduct contemplated by this rule. Appellees contend that a proper foundation was laid for the introduction of habit

15

evidence, as Dr. Davis testified to the fact that she had likely examined thousands of patients arriving on backboards, and that she performed the same process "the same way, every single time, every day that I work." We agree with appellees and shall explain.

Rule 5-406 provides:

> Evidence of the habit of a person or of the routine practice of an organization is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.

Rule 5-406 is patterned after Federal Rule of Evidence ("FRE") 406. *Lai v. Sagle*, 373 Md. 306, 322 n.8 (2003) (stating that Rule 5-406 "is patterned after the corresponding federal rule"). FRE 406 provides:

> Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. This court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.

In *Sobus v. Knisley*, this Court considered what evidence was admissible under the common law precursor to Rule 5-406. 11 Md. App. 134, *cert. denied*, 261 Md. 728 (1971). Knisley and Sobus were involved in an automobile accident where each party was the lone motorist in his respective vehicle, and neither remembered the collision. *Id.* at 135. Knisley, a supervisor at a state hospital, was searching for a patient who had "eloped" and testified without objection regarding his habit of driving a certain route when searching for "elopees." *Id.* at 139. Knisley was asked to mark the route he normally took on a map that had been entered into evidence. *Id*. at 140. The trial judge overruled an objection, allowing Knisley

to draw his normal route on the map. *Id.* Knisley testified: "[T]hat's the first trip that is taken in search of any patient that leaves Springfield State Hospital. That's the initial one." *Id.*

On appeal, we held that the trial court did not err in allowing such evidence to be admitted. We cited to I Wigmore on Evidence § 92 (3d ed. 1940):

> "Of the probative value of a person's habit or custom, as showing the doing on a specific occasion of the act which is the subject of the habit or custom, there can be no doubt. Every day's experience and reasoning make it clear enough."

Wigmore then goes on to discuss cases in which the evidence may not show sufficient regularity to make it probable that it would be carried out in every instance or in most instances. He then goes on to say, in § 93:

> "Subject to the foregoing distinctions, the admissibility of a person's habit, usage, or custom as evidence that he did or did not do the act in question may be said to be universally conceded."

*Sobus*, 11 Md. App. at 141. We concluded "that evidence that an act was habitually done by X under like circumstances will be received as evidence that it was done by X on the particular occasion." *Id.* (citation and internal quotation marks omitted). Thus we concluded that the trial court did not err in allowing the admission of the habit evidence. *Id.*

In the context of a medical malpractice action, however, there is a dearth of case law in Maryland regarding Rule 5-406. In a footnote in *Lai*, the Court of Appeals stated that the

17

fact that an individual has been sued multiple times for malpractice does not constitute habit or routine practice under Rule 5-406. 373 Md. at 322 n.8. In *Dehn v. Edgecombe*, this Court held that Rule 5-406 was "not remotely applicable" where the appellant tried to show the appellee doctor's "routine procedure with respect to referring patients to specialists . . . but then continuing to monitor their follow-up care himself" by adducing evidence of a single occasion where the appellee referred the appellant to a surgeon and, ten months later, made a second referral of the appellant to the same surgeon. 152 Md. App. 657, 672-73 (2003), *aff'd*, 384 Md. 606 (2005).

For further direction, we turn to cases from other jurisdictions that have interpreted habit evidence under FRE 406 in medical malpractice cases. In *Weil v. Seltzer*, the appellant offered testimony of five former allergy patients to whom the appellee physician prescribed steroids, but represented to them that the drugs were antihistamines or decongestants. 873 F.2d 1453, 1459-60 (D.C. Cir. 1989). The trial court admitted the testimony over objection as habit evidence under FRE 406. *Id.* at 1460. The D.C. Circuit, reviewing the trial court's ruling under an abuse of discretion standard, held that the district court abused its discretion in allowing the former patients' testimony under FRE 406. *Id.* The D.C. Circuit explained:

> Rule 406 allows certain evidence which would otherwise be inadmissible if it rises to the level of habit. In this context, habit refers to the type of nonvolitional activity that occurs with invariable regularity. It is the nonvolitional character of habit evidence that makes it probative. *See, e.g.*, *Levin v. United States*, 338 F.2d 265, 272 (D.C. Cir. 1964) (testimony concerning religious practices not admissible because "the very volitional basis of the activity raises serious questions as to its invariable nature, and hence its probative

18

value"), *cert. denied*, 379 U.S. 999, 85 S. Ct. 719, 13 L. Ed. 2d 701 (1965). *But see Perrin v. Anderson*, 784 F.2d 1040, 1046 (10th Cir. 1986) (five instances of violent encounters with police sufficient to establish "habit" of reacting violently to uniformed police officers). **Thus, habit is a *consistent* method or manner of responding to a particular stimulus.** Habits have a reflexive, almost instinctive quality. The advisory committee notes on Rule 406 illustrate this point:

> **A habit . . . is the person's regular practice of meeting a particular kind of situation with a specific type of conduct**, such as the habit of going down a particular stairway two stairs at a time, or of giving the hand-signal for a left turn, or of alighting from railway cars while they are moving. The doing of habitual acts may become semi-automatic.

*Weil*, 873 F.2d at 1460 (bold emphasis added). The court in *Weil* also noted that to determine whether conduct rises to the level of "habit," a court must consider the "'adequacy of sampling and uniformity of responses.'" *Id.* (quoting Fed. R. Evid. 406 advisory committee's note).

In *Aikman v. Kanda*, the District of Columbia Court of Appeals was presented with a factual scenario similar to the matter *sub judice*. 975 A.2d 152 (D.C. 2009). Aikman suffered an embolic stroke one day after Dr. Kanda performed open-heart surgery to repair Aikman's mitral valve. *Id.* at 155. Aikman filed suit against Dr. Kanda for negligence, claiming that he "either failed to employ procedures to remove air from her heart (so-called 'air drill' procedures) before completing the surgery, or performed the air drill inadequately." *Id.* There was no notation in Aikman's medical chart that the air drill procedure was performed, and neither Dr. Kanda nor any member of his surgical team could remember the

19

specifics of Aikman's procedure, due to the lapse of time between the surgery and litigation and the volume of procedures. *Id.* at 157. At trial, "[o]ver objections by Aikman's counsel, Dr. Kanda testified about the air drill procedures that he routinely performs after completing a mitral valve repair." *Id.* at 162.

After the jury returned a verdict for Dr. Kanda on all counts and Aikman's motion for a new trial was denied, Aikman noted an appeal, contending that Dr. Kanda's routine practice of air removal following surgery was inappropriate character evidence, rather than admissible habit evidence. *Id.* 162-63. Aikman asserted that the protocol of removing air from the heart could not be considered habit evidence, because it was a complex medical procedure, and not "semi-automatic in nature." *Id.* at 163. The Court determined that Dr. Kanda's testimony regarding the air drill protocol was habit evidence, reasoning that utilizing the same procedure in over 500 mitral valve operations equated to a "regular response to a repeated situation." *Id.* (citation and internal quotation marks omitted). In assessing the volitional nature of the habitual conduct, the Court stated that it was "relevant to its probative force, not its admissibility." *Id.* at 164.

The elements considered by the courts in *Weil* and *Aikman* when assessing the admissibility of habit evidence are the very same elements critical to our decision in the instant matter. *Aikman* involved a doctor who met a "particular kind of situation" (mitral valve surgery) with a "specific type of conduct" (air drill procedure). *See Weil*, 873 F.2d at 1460; *Aikman*, 975 A.2d at 162. The instant case involves a doctor who met a particular kind

20

of situation (a patient on a backboard) with a specific type of conduct (examining the spine prior to removal). In determining the regularity of the conduct, the *Aikman* court relied on Dr. Kanda's history of performing the air drill procedure in every one of his more than 500 mitral valve operations. 975 A.2d at 163. At trial in the instant case, Dr. Davis testified to treating "several" patients per shift who were presented by ambulance on a backboard, working at Memorial Hospital for four and a half years, seeing 5,000 to 6,000 patients per year, and conducting a spine examination on every patient on a backboard before removal.

Dr. Davis testified:

| [APPELLEES' TRIAL COUNSEL]: | Dr. Davis, is the process that you just took us through, is that something that you do once in awhile, every so often? With what sort of frequency do you do that? |
|---|---|
| *** | |
| [DR. DAVIS]: | **I do the same process every time I have a patient on the backboard.** The nurses don't take patients off the backboard. The paramedics don't take them off the backboard. **It's only the physician that can, what we call, clear the spine and I do it the same way, every single time, every day that I work.** |
| [APPELLEES' TRIAL COUNSEL]: | How many patients have |

21

you taken off a backboard without doing the examination that you described?

[DR. DAVIS]:                                    **None.**

(Emphasis added).

Appellant argues that Dr. Davis's procedure for examining the spine before removal of a patient from a backboard cannot be admissible habit evidence, because it is a "variable activity which requires thought and decision making." The Court in *Aikman* rejected a similar argument that a complex surgical procedure "cannot be so free from volition as to regard it as habit." 975 A.2d at 163-64. The Court reasoned that the large number of times that Dr. Kanda performed the air drill procedure, the specificity with which he described the procedure, and the high "ratio of reactions to situations" described by Dr. Kanda could not lead to the conclusion that the trial judge "erred in determining that, for Dr. Kanda, the air drill was semi-automatic in nature." *Id.* at 163. Furthermore, "[t]he volitional aspect of the de-airing procedures . . . went to the weight of the evidence of Dr. Kanda's habit but did not require its exclusion." *Id.* at 164 (alterations in original). Similarly, from Dr. Davis's testimony, which included how she "clear[ed] the spine" and did it "the same way, every single time," the large number of times that she performed the procedure, and the certainty of performing the procedure every time a patient was removed from a backboard, we conclude that the trial court did not err or abuse its discretion in admitting Dr. Davis's testimony as habit evidence under Rule 5-406.

22

### (b) Corroboration

Appellant contends that the habit evidence was inadmissible because it was "unsupported and uncorroborated by any substantive evidence." According to appellant, the "'habit' of an individual . . . is proven by testimony of a witness who is sufficiently familiar with the individual to conclude that the conduct in question is habitual, or, physical evidence is introduced along with the testimony by [the] individual whose conduct is in question." Appellant argues that the habit testimony provided at trial by a nurse who had worked with Dr. Davis was not preceded by the necessary foundation; specifically, "[h]e was not asked about how frequently he had worked with [Dr. Davis] or if he was familiar with her 'habit' of examining a patient's back prior to allowing the patient of[f] a backboard." Appellant concludes that, because Dr. Davis had no memory of Phillips or her emergency room examination, any testimony by Dr. Davis concerning her habit, without support or corroboration, "should have been stricken as self-serving, unsupported character testimony."

Appellees respond that it is unnecessary to corroborate habit evidence, because a lack of corroboration goes to the "weight of the evidence, and not its admissibility." We agree.

The Court of Appeals has specifically found, as noted in appellees' brief, that one method of proving habit is "'by the individual himself or herself, who has lost his or her memory as to the specific occasion.'" *Ware v. State*, 360 Md. 650, 676 n.8 (2000) (quoting Lynn McClain, 5 <u>Maryland Evidence</u> § 406.1 (1987 & Supp. 1995)), *cert. denied*, 531 U.S. 115 (2001). The instant case falls squarely into this category of proving habit by one's self,

because Dr. Davis had no memory of treating Phillips due the volume of patients that she had treated since seeing Phillips on November 21, 2003. We find additional support in Professor McClain's treatise, which explains that Rule 5-406 omitted the language of the federal rule

> that provides that corroborating evidence is not a prerequisite to the admissibility of habit or routine practice. Because this prerequisite was not required by then current Maryland case law, it was thought to be unnecessary and confusing to mention it in the rule. No substantive change from the federal rule was intended.

McClain, *supra*, § 406:1 n.13 (2013 ed.).

We conclude that the trial court did not abuse its discretion in admitting evidence of Dr. Davis's "clear[ing] the spine" procedure when presented with a patient on a backboard, because there is no requirement that the habit testimony of Dr. Davis be corroborated by other evidence, and, as discussed, such conduct is of the nature contemplated by Rule 5-406.

### (c) Rule 5-403

Appellant next asserts that the habit evidence offered by appellees runs afoul of the balancing test required by Rule 5-403, because the probative value of such evidence is substantially outweighed by the danger of unfair prejudice and confusion on the issues. Appellant argues that the testimony was "irrelevant as it served no purpose in evaluating whether or not Dr. Davis complied with the standard of care." We disagree.

Rule 5-403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." In this case, Dr. Davis's testimony regarding her repeated and unfailing

24

habit of "clear[ing] the spine" before removing a patient from the backboard is probative as to whether she did so when she examined Phillips, a fact that is of great import in this case. The jury also heard evidence that Dr. Davis could not recall her treatment of Phillips and that she did not document her examination of Phillips's spine in the Emergency Physician Record. We do not believe that this testimony, taken as a whole, would prejudice or mislead a jury. Rather, we conclude that the jury, having heard the evidence, could weigh the testimony and decide what weight to afford it.

### 3. Expert Testimony

Appellant contends that the trial court erred in allowing Dr. Jeffrey Smith and Dr. Michael Van Rooyen to testify as emergency medicine experts, because their respective testimonies were based solely on the depositions and emails of Dr. Davis, which did not represent a sufficient factual and scientific basis. Appellees respond that Dr. Davis's deposition testimony and relevant medical records were a sufficient basis for the standard of care testimony given by Dr. Smith and Dr. Van Rooyen. Because we have already determined that the trial court did not err in allowing Dr. Davis's testimony into evidence, it follows that the expert testimony relying on Dr. Davis's testimony was also properly admitted.

The admissibility of expert testimony is governed by Rule 5-702, which states:

> Expert testimony may be admitted, in the form of an opinion
> or otherwise, if the court determines that the testimony will assist the
> trier of fact to understand the evidence or to determine a fact in issue.
> In making that determination, the court shall determine (1) whether

the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

With respect to the third requirement, whether there is a sufficient factual basis to support the expert testimony, the "'factual basis for expert testimony may arise from a number of sources, such as facts obtained from the expert's first-hand knowledge, facts obtained from the testimony of others, and facts related to an expert through the use of hypothetical questions.'" *Wantz v. Afzal*, 197 Md. App. 675, 684 (quoting *Sippio v. State*, 350 Md. 633, 653 (1998)), *cert. denied*, 420 Md. 463 (2011). The Court of Appeals has held that expert witnesses can rely on deposition testimony to formulate their opinion. *Greenstein v. Meister*, 279 Md. 275, 285-86 (1977).

Clearly, the expert opinions of Dr. Smith and Dr. Van Rooyen were based on the deposition of Dr. Davis. At trial, Dr. Van Rooyen expressly set forth the factual foundation of his opinion, as evidenced by the following exchange:

| | |
|---|---|
| [APPELLEES' TRIAL COUNSEL]: | The question was: **Based on your review of Dr. Davis'[s] deposition** and your training and experience, do you have an understanding as to what was done with respect to [ ] Phillips'[s] back? |
| [DR. VAN ROOYEN]: | **So based on Dr. Davis'[s] deposition** and also, I think, the way that, as I said, we are trained, |

26

typically, to approach patients like this, it was indicated that she documented some of the findings that she had while **she** was at the bedside or potentially documented at the bedside and then **proceeded to do the kind of head-to-toe brief physical exam that we do to get the patient off the backboard or to determine if the patient has injuries on the spot.**

(Emphasis added).

Similarly, Dr. Smith indicated the foundation for his opinion as follows:

[APPELLEES' TRIAL COUNSEL]: So on what basis do you say that Dr. Davis examined the back?

[DR. SMITH]: **Because Dr. Davis stated in her deposition that her approach to every patient on the backboard**, which is the emergency medicine approach to every patient on the backboard, **is to examine the front, to make sure the neck is okay and then to logroll the patient and feel the entire back, including the spine. That's done every time.** In our institution, I do it 15 times a day when

> I'm working. It[']s standard. It[']s like breathing or drinking water.

(Emphasis added).

Because, as discussed previously, Dr. Davis's testimony regarding her invariable practice of examining the spine of a patient presented on a backboard was admissible pursuant to Rule 5-406, it was appropriate for both experts to rely on such facts in forming their opinions. Accordingly, the trial court did not abuse its discretion in admitting the expert opinions of Drs. Van Rooyen and Smith.

**JUDGMENT OF THE CIRCUIT COURT FOR QUEEN ANNE'S COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**